# FILED

**UNITED STATES DISTRICT COURT**     JUN 2 1 2005     NF
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>FIRST MIDWEST BANK, an Illinois banking corporation, SIT INVESTMENT ASSOCIATES, INC., a Minnesota corporation, BERGEN CAPITAL, INC., a New Jersey corporation, HEMISPHERE TRUST, a Channel Islands limited liability company, and CHRISTOPHER J. HALL, )<br><br>Defendants. ) | Case No. **05C 3607**<br><br>Judge _____ **JUDGE BUCKLO**<br><br>JURY TRIAL DEMANDED<br>**MAGISTRATE JUDGE COLE** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Manufacturers and Traders Trust Company, in its capacity as Trustee ("MTTC," or "Successor Trustee"), by its undersigned attorneys, allege for its complaint (the "Complaint") against defendants First Midwest Bank ("FMB" or "Prior Trustee"), SIT Investment Associates, Inc. ("SIT"), Bergen Capital, Inc. ("Bergen"), Hemisphere Trust ("Hemisphere"), and Christopher J. Hall (collectively with SIT, Bergen, and Hemisphere, the "Current Bondholders") upon personal knowledge of its own respective acts and upon information and belief as to all other matters, as follows:

## SUMMARY OF THE ACTION

1.     This action arises from MTTC's undisputed right to recover its attorneys' fees and costs incurred while serving as Trustee for certain Student Housing Revenue Bonds. Following its appointment as Trustee by the requisite majority of bondholders, as discussed in more detail below, MTTC incurred attorneys' fees and costs in connection with its fiduciary duties as

Trustee. In an apparent attempt to avoid their liability under the Trust Indenture for MTTC's attorneys' fees and costs, the Current Bondholders now seek to "rescind" MTTC's appointment as trustee with an instrument ("Instrument of Rescission") that does not comply with the terms of the Indenture, that was never properly delivered to MTTC, and that purports to authorize the Prior Trustee to distribute and disperse the certain funds held in trust and against which MTTC has a lien for its attorneys' fees and costs. Accordingly, MTTC seeks by its Complaint a judgment enjoining FMB and the Current Bondholders from dispersing or otherwise disposing of the Trust assets, and a judgment declaring that the Instrument of Rescission has no effect on MTTC's appointment as Trustee.

## THE PARTIES

2.     Manufacturers and Traders Trust Company is a New York banking corporation with a corporate trust office in Baltimore, Maryland.

3.     First Midwest Bank is an Illinois banking corporation with its principal place of business in Joliet, Illinois.

4.     SIT Investment Associates, Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

5.     Bergen Capital, Inc. is a New Jersey corporation with its principal place of business in Harsbrouck Heights, New Jersey.

6.     Hemisphere Trust is a limited liability company formed under the laws of Jersey, Channel Islands with its principal place of business in Jersey, Channel Islands.

7.     Christopher J. Hall is a citizen of the State of Florida with his primary residence in Miami Shores, Florida.

2

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity between the parties, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

9.     Venue of this action in this district is proper pursuant to 28 U.S.C. § 1391(a)(2). A substantial part of the events giving rise to the action occurred in this district.

## BACKGROUND

### FMB's Removal as Trustee and MTTC's Appointment as Successor Trustee

10.     Pursuant to that certain Trust Indenture, dated as of May 1, 2002 (the "Indenture"), between the County of Will, Illinois ("Will County") and FMB, as Trustee, Will County issued its $13,985,000.00 Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A, and its $470,000.00 Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (collectively, the "Bonds;" and the holders thereof, "Bondholders"). The Indenture was recorded on May 23, 2002 in the Office of the Will County Recorder of Deeds as Document R2002086521. (A copy of the Indenture is attached hereto as Exhibit A.)

11.     Pursuant to that certain Loan Agreement, dated as of May 1, 2002 (the "Loan Agreement"), between Will County and Foundation Housing, LLC ("Foundation Housing" or the "Borrower"), Will County loaned the proceeds of the Bonds to the Borrower, and the Borrower agreed to repay such loan. The Loan Agreement was recorded on May 23, 2002 in the office of the Will County Recorder of Deeds as Document R2002086522. The obligations of the Borrower were further evidenced by that certain Note No. 1, dated May 1, 2002, from the Borrower to Will County, in the principal amount of $14,455,000 (the "Note"), and that certain

3

Mortgage, Security Agreement, and Assignment of Rents and Leases, dated as of May 1, 2002, by the Borrower in favor of Will County and assigned to the Trustee (the "Mortgage"), which was recorded on May 23, 2002 in the office of the Will County Recorder of Deeds as Document R 2002086520.

12.     Under the terms of the Indenture, the Loan Agreement, the Note, and the Mortgage, Will County assigned all of its right, title and interest in and to the Loan Agreement (with limited exceptions pertaining to Will County's rights to indemnity, to decline to make additional loans, and to receive notices), the Note, and the Mortgage to the Trustee under the Indenture. This assignment explicitly included Will County's assignment to the Trustee of Will County's right to receive payments from the Borrower under the Loan Agreement, the Note, and the Mortgage. These payments by the Borrower repaid the loan of the proceeds of the Bonds, and were to be made directly to the Trustee on behalf of the Bondholders.

13.     On February 24, 2005, Columbia Management Advisors and SIT (collectively, the "Prior Majority Bondholders"), then owners of approximately 69% in aggregate principal amount of the Bonds, delivered to FMB an "Instrument of Removal of Trustee, Appointment of Successor Trustee, and Acceptance by Successor Trustee" ("Instrument of Removal"), and a letter of direction ("Letter of Direction"), both dated February 23, 2005. (A copy of the Instrument of Removal and Letter of Direction are attached hereto as Exhibits B and C, respectively.)

14.     The Prior Majority Bondholders owned more than the aggregate principal amount of the outstanding Bonds required to execute the Instrument of Removal, pursuant to Section 908 of the Indenture. (Exhibit A at p. 47.)

15.     Under the Instrument of Removal, the Prior Majority Bondholders removed FMB as Trustee under the Indenture, and also as trustee of funds, as registrar, and as paying agent for the Bonds, pursuant to Sections 907 and 910 of the Indenture. (Exhibit B at p. 2.) The removal of FMB from these roles was effective immediately upon FMB's receipt of the Instrument of Removal. (Exhibit B at p. 2.)

16.     Section 907 of the Indenture, as referenced in the Instrument of Removal provides:

> **Removal of the Trustee.** The Trustee may be removed at any time by an instrument or concurrent instruments in writing signed by the Registered Owners of more than 50% of the aggregate principal amount of the Bonds then Outstanding and delivered to the Trustee and the Issuer. The Trustee may additionally be removed by a written instrument of the Issuer delivered to the Trustee and the Registered Owners of the Bonds then Outstanding. A removal takes effect upon the appointment of a successor or temporary Trustee by the Registered Owners or the Issuer and the successor or temporary Trustee's acceptance of its appointment, all in accordance with Section 403 of this Indenture.

(Exhibit A at p. 47.)

17.     Section 910 of the Indenture, as referenced in the Instrument of Removal, provides:

> **Successor Trustee as Trustee of Funds, Paying Agent and Registrar.** In the event the Trustee is changed the prior Trustee which has resigned or been removed ceases to be trustee of the Indenture Funds and Registrar and paying agent for principal of, premium, if any, and interest on the Bonds and the successor Trustee becomes the Trustee, Registrar, and paying agent.

(Exhibit A at p. 48.)

18.     Under the Instrument of Removal, the Prior Majority Bondholders appointed MTTC as Successor Trustee pursuant to Section 908 of the Indenture, and also provided that MTTC should act as trustee of funds, as registrar, and as paying agent for the Bonds as required under Section 910 of the Indenture. (Exhibit B at p. 2.)

19.     Section 908 of the Indenture, as referenced in the Instrument of Removal,

provides:

> **Successor or Temporary Trustee.** In case the Trustee resigns, [or] is removed,
> ... a successor may be appointed by the holders of more than 50% of the
> aggregate principal amount of the Bonds then Outstanding by an instrument or
> concurrent instruments in writing signed by the holders of more than 50% of the
> aggregate principal amounts of the Bonds then Outstanding.

(Exhibit A at p. 47.)

20.     The Indenture's Granting Clauses also provided MTTC, as Successor Trustee,

with a lien and security interest in the Trust funds, stating that "to secure the performance and

observance by the Issuer of all the covenants expressed or implied herein and in the Bonds," the

Issuer "does hereby grant ..., transfer, collaterally assign, grant a security interest in, and pledge

unto the following (the "Trust Estate") to the Trustee and its successors in trust and assigns

forever:"

> [T]he Issuer's entire right, title, and interest in and to each of the Borrower's
> Documents, specifically including the Issuer's right to receive payments from the
> Borrower under the Notes, the Mortgage and the Loan Agreement;
>
> The Issuer's entire right, title and interest in and to all Pledged Revenues; and
>
> All other real or personal property from time to time conveyed, pledge, assigned,
> or transferred to the Trustee as additional security under this Indenture which
> property the Trustee is hereby authorized to receive;
>
> There is, however, expressly excepted and excluded from the lien and operation
> of this Indenture amounts held by the Trustee in the Rebate Fund (as defined in
> the Loan Agreement); ...

(Exhibit A at p. 3.)

21.     The Instrument of Removal, in accordance with Section 909 of the Indenture,

provided that the appointment of the Successor Trustee was "effective immediately upon receipt

of this Instrument by the Prior Trustee, the Issuer, and the Borrower," and further stated that

immediately upon such receipt, "the Successor Trustee shall become fully vested with all the property, rights, powers and duties of the Prior Trustee under the Indenture." (Exhibit B at p. 2.)

22.     The Instrument of Removal is valid and enforceable under the Indenture, and was sufficient under the Indenture to remove FMB as Trustee and appoint MTTC as Successor Trustee.

23.     The Instrument of Removal, pursuant to Section 909 of the Indenture, required FMB as the Prior Trustee to do the following:

> [E]xecute, acknowledge and deliver such instruments of conveyance and do such other things as may reasonably be required by the Successor Trustee or its counsel for more fully and certainly vesting and confirming in the Successor Trustee all the trusts, powers, and duties under the [Trust] Indenture and the Mortgage and any other property held by the Prior Trustee under the Indenture, and shall pay over, assign and deliver to the Successor Trustee any money or other property subject to the trusts and conditions set forth in the [Trust] Indenture.

(Exhibit B at p. 3.)

24.     Section 909 of the Indenture, as referenced in the Instrument of Removal, provides:

> [The] predecessor [trustee] agrees, nevertheless, on the written request ... of its successor, to execute and deliver an instrument transferring to its successor all the estates, properties, rights, powers and trusts of the predecessor under this Indenture. Every Prior Trustee agrees it will deliver all securities and money held by it as Trustee under this Indenture to its successor.

(Exhibit A at p. 47.)

### FMB Commences an Interpleader Action Following Its Removal as Trustee

25.     On March 7, 2005, FMB filed a Complaint for Interpleader in the Circuit Court of Will County, Illinois (the "Interpleader Action"), alleging that "there are conflicting claims against [FMB] with regards to" the interpleaded sum of $485,560.47, which constitutes the "payment of interest on bonds which was due March 1, 2005." (Complaint for Interpleader at ¶¶ 9 and 16, attached hereto as Exhibit D.) FMB received the Instrument of Removal eleven days

before commencing the Interpleader Action. Despite the Instrument of Removal's valid and binding instruction that FMB must immediately pay over, assign, and deliver all of the trust funds to MTTC, FMB took no steps to comply with the Instrument of Removal.

26.     FMB did not name MTTC as a defendant in the Interpleader Action. Instead, FMB named Will County, Foundation Housing, LLC, Columbia, and SIT as defendants. In its Complaint for Interpleader, FMB alleged that on March 1, 2005, FMB's counsel received a communication from counsel for Foundation Housing, LLC – the borrower identified in the Indenture – demanding that the Fund be used to pay the March 1, 2005 interest payment.

27.     Because it was not named as a defendant, and in furtherance of its fiduciary duties under the Indenture as Successor Trustee, on March 30, 2005, MTTC filed its Petition to Intervene ("Petition") in the Interpleader Action. In that Petition, MTTC asserted that the Interpleader Action was improper, that no party in the action had disputed that MTTC is the Successor Trustee or that MTTC, as Successor Trustee, should have immediate possession and control of the Interpleaded Funds. MTTC further stated that there was no dispute that FMB must comply immediately with the Instrument of Removal, and that MTTC was entitled to the immediate turnover and payment of the Interpleaded Funds. (A copy of MTTC's Petition to Intervene, without exhibits, is attached hereto as Exhibit E.)

28.     In its Petition, MTTC also asserted a claim to recover its costs and attorneys' fees pursuant to Sections 901(c) and 902 of the Indenture. Section 901(c) of the Indenture provides:

> The Trustee is entitled to advice of Counsel concerning all matters of trusts and duties arising under this Indenture and may pay reasonable compensation to all Counsel, agents, receivers an employees as it may reasonably employ in connection with this Indenture.

(Exhibit A at p. 43.) Section 902 of the Indenture provides that "[t]he Trustee is entitled to payment or reimbursement of Trustee's Expenses." (Exhibit A at p. 46.)

29. On information and belief, after February 24, 2005, but prior to March 30, 2005, Columbia Management Advisors sold its $8,800,000.00 interest in the Bonds to one or more of the Current Bondholders.

30. On April 5, 2005, following discussions with representatives of the Current Bondholders, MTTC sent to the Current Bondholders a proposed instrument ("Proposed Instrument") providing for: (1) the voluntary dismissal of the Interpleader Action, (2) payment of MTTC's attorneys' fees and costs, (3) FMB's reinstatement as trustee, and (4) indemnification of MTTC's acts as trustee. (A copy of MTTC's April 5, 2005 correspondence and Proposed Instrument is attached hereto as Exhibit F.) The Current Bondholders never executed the Proposed Instrument or otherwise tendered to MTTC any instrument of removal.

31. No party filed any response to MTTC's Petition. Instead, on June 9, 2005, FMB served via facsimile to MTTC its Motion to Dismiss the Interpleader Action, noticing a hearing of said motion on June 14, 2005. However, because FMB failed to provide proper notice of the motion, the Circuit Court of Will County entered and continued both FMB's Motion to Dismiss and MTTC's Petition to Intervene to June 21, 2005.

32. At the June 14, 2005 hearing, counsel for FMB presented to MTTC's counsel a copy of the "Instrument of Rescission of Instrument of Removal of Trustee and Appointment of Successor Trustee, dated February 23, 2005, and the Rejection and Voidance of the Accompanying Acceptance of Manufacturers and Traders Trust Company as the Successor Trustee, All in Connection with the [Series 2002A and Taxable Series 2002B Bonds" ("Instrument of Rescission"), dated June 6, 2005. (A copy of the Instrument of Rescission is attached hereto as Exhibit G.) Although purportedly executed on June 6, 2005, MTTC never received, and still has not received, a copy of the Instrument of Rescission.

33. The Instrument of Rescission purports to "rescind[] and deem[] void *ab initio* the [Instrument of Removal]," and provides:

> First Midwest Bank, as Trustee, is hereby directed and instructed by the undersigned to disregard the [Instrument of Removal] and to continue to perform its duties as trustee in connection with the Bonds. Fist Midwest Bank, as Trustee, is hereby directed to transfer the funds it is holding in connection with the payment of interest on the Bonds into a separate account with First Midwest Bank in the names of the undersigned, as tenants in common in accordance with their respective interests of ownership.

(Exhibit G at p. 3.)

34. The Instrument of Rescission purports to rescind the Instrument of Removal despite the clear requirements and terms of the Indenture. Specifically, Section 901(g) states:

> The Trustee is protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document believed to be genuine and to have been signed or sent by the proper person. Any action taken by the Trustee pursuant to this Indenture upon the request, authority or consent of any person who at the time of making the request or giving the authority or consent is the holder of any Bonds is conclusive and binding upon all future holders of the same Bonds and upon Bonds issued in exchange for it or in place of it.

(Exhibit A, § 901(g) at p. 44.) Accordingly, and for other reasons, the Current Bondholders may not simply rescind the Instrument of Removal and are bound by the actions of the Prior Majority Bondholders, and MTTC's acceptance of its position as Successor Trustee is binding upon the Current Bondholders.

35. Section 901(o) states:

> Before taking any action within the scope of the Indenture, the Trustee may require that indemnity satisfactory to it be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability which it may incur except liability which is adjudicated to have resulted from its gross negligence or willful default.

(Exhibit A, § 901(o) at p. 45.) In its April 5, 2005 correspondence to the Current Bondholders, MTTC made clear that it would require an indemnification provision to be included in any instrument purporting to remove MTTC as Trustee. The Instrument of Rescission contains no

10

such indemnification in favor of MTTC, and is therefore of no force as to MTTC.

## COUNT I: CLAIM FOR INCURRED ATTORNEYS' FEES
## AND COSTS UNDER THE INDENTURE

36.    MTTC incorporates by reference the allegations of paragraphs 1-35 above as if fully stated herein.

37.    Pursuant to the February 23, 2005 Instrument of Removal, the Prior Majority Bondholders offered, and MTTC accepted, the position of Successor Trustee.

38.    The Indenture and Instrument of Removal contained definite and certain terms regarding the scope of MTTC's rights and responsibilities under the Indenture. In furtherance of its duties as Successor Trustee, and in accordance with the instructions contained in the Instrument of Removal, MTTC intervened in the Interpleader Action to obtain possession of the Trust Funds.

39.    Pursuant to Sections 901 and 902 of the Indenture, MTTC was entitled to retain counsel, and is entitled to payment or reimbursement of its expenses, including, but not limited to, attorneys' fees and costs.

40.    In breach of the Indenture, the Current Bondholders have failed to reimburse MTTC its attorneys' fees and costs incurred with respect to the Interpleader Action. The Current Bondholders have also breached the terms of the Indenture by attempting to remove MTTC as Trustee without providing MTTC's requested indemnification.

41.    Pursuant to the Indenture's Granting Clauses, MTTC possesses a security interest and lien with respect to its incurred attorneys' fees and costs in furtherance of its duties as Trustee.

11

42.     MTTC has been damaged by the Current Bondholders' failure to reimburse MTTC's incurred attorneys' fees and costs and to provide the requisite indemnification to MTTC.

WHEREFORE, MTTC respectfully requests that this Court:

A.     Enter a judgment in favor of MTTC for its attorneys' fees and costs incurred during the course of performing its duties as Trustee for the Bonds;

B.     Enjoin FMB and the Current Bondholders from dispersing or otherwise disposing of the Trust funds or assets in the amount of MTTC's current and anticipated amount of incurred attorneys' fees and costs;

C.     Award MTTC its actual damages arising from Defendants' failure to reimburse MTTC its attorneys' fees and costs in an amount to be determined at the time of judgment, including, but not limited to, the costs and attorneys' fees incurred by MTTC in connection with this litigation;

D.     Grant such further and additional relief as this Court deems just and proper.

## COUNT II – DECLARATORY RELIEF

43.     MTTC incorporates by reference the allegations of paragraphs 1-42 above as if fully set forth herein.

44.     Effective as of February 24, 2005, and pursuant to the Indenture and Instrument of Removal, FMB was removed as Trustee for the Bonds.

45.     Effective as of February 24, 2005, and pursuant to the Indenture and Instrument of Removal, MTTC was appointed as Successor Trustee to the Bonds.

46.     The Instrument of Removal complied with all requirements under the Indenture, and conferred on MTTC all of the rights and powers of a trustee under the Indenture.

47.     Pursuant to Section 901(g) of the Indenture, the Current Bondholders are incapable of rescinding the Instrument of Removal, and are bound by the actions of the Prior Bondholders and MTTC's acceptance of its position as Successor Trustee. Additionally, the Current Bondholders have yet to deliver a copy of the Instrument of Rescission to MTTC.

48. Pursuant to Section 901(o) of the Indenture, before MTTC may be removed as Trustee, the Current Bondholders are required to provide an indemnity providing for reimbursement of all of MTTC's expenses to which it may be put and to protect it against all liability which it may incur.

WHEREFORE, MTTC prays that this Court find and declare that the Indenture and Instrument of Removal conferred on MTTC all of the rights and powers of a trustee under the Indenture, that the Instrument of Rescission is null and void, should be given no effect, and otherwise does not rescind the Instrument of Removal, and grant such further and additional relief as this Court deems just and proper.

Chicago, Illinois:  
Dated: June 20, 2005

Respectfully submitted,

MANUFACTURERS AND TRADERS  
TRUST COMPANY

By One of Its Attorneys

Francis A. Citera (ARDC No. 6185263)  
Matthew F. Prewitt (ARDC No. 6237904)  
Edward M. Shin (ARDC No. 6275913)  
GREENBERG TRAURIG LLP  
77 West Wacker Drive, Suite 2500  
Chicago, Illinois 60601  
(312) 456-8400 – Telephone  
(312) 456-8435 – Facsimile

Of Counsel:  
Warren S. Bloom  
Amy E. Lowen  
GREENBERG TRAURIG, P.A.  
450 South Orange Ave., Suite 650  
Orlando, FL 32801  
(407) 420-1000 – Telephone  
(407) 650-8482 – Fax

# EXHIBIT A

TENTH DRAFT DATED: May 22, 2002

This Document Prepared By
and After Recording Return To:

James E. Luebchow
Chapman and Cutler
111 West Monroe Street
Chicago, Illinois 60603

MARY ANN STUKEL                89P
* Will County Recorder
Will County
R 2002086521          Page 1 of 89
HMC Date 05/23/2002    Time 13:29:54
Recording Fees:              103.00

SPACE ABOVE THIS LINE RESERVED FOR
RECORDER'S USE ONLY

TRUST INDENTURE

BETWEEN

THE COUNTY OF WILL, ILLINOIS

AND

FIRST MIDWEST BANK

DATED AS OF MAY 1, 2002

RELATING TO

$13,985,000
THE COUNTY OF WILL, ILLINOIS
STUDENT HOUSING REVENUE BONDS
(JOLIET JUNIOR COLLEGE PROJECT),
SERIES 2002A

AND

$470,000
THE COUNTY OF WILL, ILLINOIS
STUDENT HOUSING REVENUE BONDS
(JOLIET JUNIOR COLLEGE PROJECT),
TAXABLE SERIES 2002B

TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

| | Parties | 1 |
| | Granting | 3 |
| ARTICLE I | DEFINITIONS, RULES OF INTERPRETATION AND EXHIBITS | 4 |
| Section 101. | Definitions | 4 |
| Section 102. | Rules of Interpretation | 4 |
| Section 103. | Exhibits A and B - Form of Bonds | 5 |
| Section 104. | Incorporation of Preamble | 5 |
| ARTICLE II | THE BONDS | 5 |
| Section 201. | Limitation | 5 |
| Section 202. | The Series 2002 Bonds | 5 |
| Section 203. | Payment of the Series 2002 Bonds | 6 |
| Section 204. | Execution | 7 |
| Section 205. | Limited Obligation | 8 |
| Section 206. | Authentication | 8 |
| Section 207. | Form of Bonds | 8 |
| Section 208. | Delivery of Bonds | 8 |
| Section 209. | Mutilated, Lost, Stolen or Destroyed Bonds | 9 |
| Section 210. | Registration, Transfer and Exchange of Bonds | 10 |
| Section 211. | Cancellation of Bonds | 10 |
| Section 212. | Temporary Bonds | 11 |
| Section 213. | Issuance of Additional Bonds | 11 |
| Section 214. | Registered Owners Treated as Registered Owners | 13 |
| Section 215. | Book-Entry-Only System | 13 |
| ARTICLE III | REDEMPTION OF BONDS BEFORE MATURITY | 15 |
| Section 301. | Redemption Generally | 15 |
| Section 302. | Events Permitting or Requiring Redemption of the Series 2002 Bonds | 15 |
| Section 303. | Redemption Notice | 15 |
| Section 304. | Redemption Payments | 16 |
| Section 305. | Selection of Bonds to be Redeemed | 16 |
| ARTICLE IV | GENERAL COVENANTS | 16 |
| Section 401. | Issuer's Covenants | 16 |
| Section 402. | Rights Under Loan Agreement | 17 |
| Section 403. | Reserved | 17 |
| Section 404. | Designation of Additional Paying Agents | 17 |

ARTICLE V          REVENUES AND FUNDS ............................................................................17

Section 501.    Creation of Pledged Revenue Fund ...........................................17
Section 502.    Creation of the Bond Fund .........................................................18
Section 503.    Creation of the Project Fund ......................................................18
Section 504.    Payments into the Pledged Revenue Fund...............................18
Section 505.    Use of Money in Pledged Revenue Fund ..................................19
Section 506.    Payments into the Bond Fund....................................................20
Section 507.    Use of Money in the Bond Fund.................................................21
Section 508.    Payments into the Project Fund .................................................22
Section 509.    Use of Money in the Project Fund .............................................22
Section 510.    Completion of the Project ..........................................................24
Section 511.    Non-presentment of Bonds ........................................................25
Section 512.    Payments to the Borrower from the Bond Fund .......................25
Section 513.    Funds Held in Trust ....................................................................25
Section 514.    Creation of the Debt Service Reserve Fund..............................25
Section 515.    Payments into Debt Service Reserve Fund ..............................25
Section 516.    Use of Money in the Debt Service Reserve Fund......................26
Section 517.    Renewal and Replacement Fund................................................26
Section 518.    Operation and Maintenance Fund..............................................27
Section 519.    Operating Reserve Fund. ...........................................................28
Section 520.    Application of Pledged Revenues to the Indenture Funds.........28
Section 521.    Escrow Fund ...............................................................................32
Section 522.    Interim Loan; Creation of Interim Loan Fund ...........................34

ARTICLE VI         INVESTMENTS .......................................................................................35

Section 601.    Investments Generally ................................................................35
Section 602.    Tax Covenants ............................................................................36
Section 603.    Change in Law.............................................................................36
Section 604.    Investment of Trust Fund Moneys .............................................36

ARTICLE VII        DISCHARGE OF INDENTURE ..................................................................36

Section 701.    Discharge ....................................................................................36

ARTICLE VIII       DEFAULTS AND REMEDIES ....................................................................38

Section 801.    Events of Default ........................................................................38
Section 802.    Remedies.....................................................................................39
Section 803.    Reserved......................................................................................40
Section 804.    Application of Proceeds ..............................................................40
Section 805.    Remedies Vested in Trustee.......................................................41
Section 806.    Rights and Remedies of the Holders of Bonds .........................42
Section 807.    Termination of Proceedings........................................................42
Section 808.    Waivers of Events of Default ......................................................42

ARTICLE IX         THE TRUSTEE.........................................................................................43

Section 901. Acceptance of the Trusts .......................................................................43
Section 902. Trustee's Expenses ...............................................................................46
Section 903. Notice to Holders of Bonds if an Event of Default Occurs ...............46
Section 904. Intervention by Trustee .........................................................................46
Section 905. Successor Trustee...................................................................................46
Section 906. Resignation by the Trustee....................................................................46
Section 907. Removal of the Trustee..........................................................................47
Section 908. Successor or Temporary Trustee............................................................47
Section 909. Concerning Any Successor Trustee ......................................................47
Section 910. Successor Trustee as Trustee of Funds, Paying Agent and
            Registrar ...............................................................................................48
Section 911. Trust Estate May Be Vested in Separate or Co-Trustee .....................48
Section 912. Conflicts of Interest...............................................................................48
Section 913. Trustee Duties to Borrower....................................................................48

ARTICLE X      SUPPLEMENTAL INDENTURES.........................................................49

Section 1001. Supplemental Indentures Not Requiring the Consent of the
             Holders of Bonds ................................................................................49
Section 1002. Supplemental Indentures Requiring the Consent of the
             Holders of Bonds ................................................................................49

ARTICLE XI     AMENDMENT OF THE BORROWER'S DOCUMENTS ..............................50

Section 1101. Amendments to the Borrower's Documents Not Requiring
             the Consent of the Holders of Bonds ................................................50
Section 1102. Amendments to the Borrower's Documents Requiring the
             Consent of the Holder of Bonds.........................................................50

ARTICLE XII    MISCELLANEOUS .............................................................................51

Section 1201. Consent of Holders of Bonds...............................................................51
Section 1202. Limitation of Rights.............................................................................51
Section 1203. No Recourse to Issuer, Borrower or Foundation ................................51
Section 1204. Severability ..........................................................................................52
Section 1205. Notices..................................................................................................52
Section 1206. Obligations Due on Saturdays, Sundays or Holidays .........................52
Section 1207. Counterparts .........................................................................................52

EXHIBIT A — Series 2002A Bond Form
EXHIBIT B — Series 2002B Bond Form
EXHIBIT C — Form of DTC Letter of Representations
EXHIBIT D — Form of Certificate of Manager
EXHIBIT E — Description of Real Estate

## TRUST INDENTURE

THIS TRUST INDENTURE, dated as of May 1, 2002 between THE COUNTY OF WILL, ILLINOIS, a body politic and corporate and a unit of local government created and existing under the laws of the State of Illinois (the "Issuer"), and First Midwest Bank, an Illinois banking corporation having a principal corporate trust office in Joliet, Illinois, as trustee (the "Trustee");

### WITNESSETH:

WHEREAS, the Issuer is a body politic and corporate and a unit of local government created and existing under the laws of the State of Illinois authorized and empowered by the Industrial Building Revenue Bond Act, 50 ILCS 445/1 *et seq.*, as amended (the "Act"), to issue its revenue bonds and to lend the proceeds thereof to qualifying entities for the purposes of financing or refinancing "industrial projects" (as defined in the Act); and

WHEREAS, Joliet Junior College Foundation (the "Foundation") is an Illinois not-for-profit corporation and a charitable organization exempted from federal income tax by virtue of its being an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, which, as part of its charitable purposes, furthers the exempt purposes of Joliet Junior College, Illinois Community College District No. 525, Counties of Will, Grundy, Livingston, Cook, Kendall, LaSalle and Kankakee and State of Illinois, a community college district which owns and operates Joliet Junior College in Joliet, Will County, Illinois (the "College"): and

WHEREAS, the College has requested the Foundation to develop a student housing project for the College (the "Series 2002 Project"); and

WHEREAS, the Foundation is willing to provide such assistance to the College, and has formed Foundation Housing, LLC, an Illinois limited liability company of which the Foundation is the sole member, for the purpose of undertaking the development and financing of the Series 2002 Project; and

WHEREAS, the Borrower has acquired the site for the Series 2002 Project, described in Exhibit E hereto, from the College pursuant to the terms of the Read Estate Vacant Land Sales Contract dated as of June 13, 2001 (the "Sale Agreement") in consideration for a Subordinate Promissory Note dated October 2, 2001 (the "Subordinate Note") from the Borrower and a Junior Mortgage from the Borrower dated as of October 2, 2001, securing such Subordinate Note; and

WHEREAS, the Issuer is authorized by the Act to issue its student housing revenue bonds to finance the cost of an "industrial project", as defined in the Act, for the purpose of relieving conditions of unemployment and underemployment and encouraging the increase of industry within the Issuer's jurisdiction, thereby reducing the evils attendant upon unemployment and underemployment; and

1

WHEREAS, the Foundation and the Borrower anticipate that approximately six (6) new permanent jobs will be created in connection with the operation of the Series 2002 Project; and

WHEREAS, the Series 2002 Project will be owned by the Borrower and located adjacent to the new entrance road for the main campus of the College at 1215 Houbolt Road, Joliet, Illinois; and

WHEREAS, the Series 2002 Project constitutes an "industrial project" within the meaning of the Act; and

WHEREAS, the Issuer has agreed to finance the costs of the Series 2002 Project through the issuance of its $13,985,000 aggregate principal amount Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A (the "Tax-Exempt Bonds") and its $470,000 aggregate principal amount Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (the "Taxable Bonds", collectively with the Tax-Exempt Bonds, the "Series 2002 Bonds", and collectively with any Additional Bonds, as defined herein, the "Bonds"); and

WHEREAS, the Bonds shall be limited obligations of the Issuer and shall not constitute a debt of the Issuer or a loan or credit extended to the Issuer within the meaning of any constitutional or statutory provision, and shall not constitute or give rise to a pecuniary liability of the Issuer or a charge against its general credit or taxing powers; and

WHEREAS, following the issuance of the Series 2002 Bonds, the Issuer will loan the proceeds of the Series 2002 Bonds to the Borrower pursuant to a Loan Agreement dated as of May 1, 2002 (the "Loan Agreement") between the Issuer and the Borrower and will cause such proceeds to be deposited in the funds and accounts established under this Indenture in the manner and to be applied as provided herein; and

WHEREAS, pursuant to the Loan Agreement, the Borrower will execute and deliver to the Trustee a promissory note in a principal amount equal to the original principal amount of the Series 2002 Bonds ("Note No. 1"), in which the Borrower will promise, subject to the conditions and limitations stated therein and in the Loan Agreement, to repay the loan of proceeds of the Series 2002 Bonds with payments in installments on the dates, and in the amounts, that payments of principal, redemption price, purchase price and interest are due on the Series 2002 Bonds, and the Borrower will convey a lien and security interest in the Series 2002 Project to the Issuer pursuant to the Mortgage (as defined in the Loan Agreement); and

WHEREAS, the Borrower is obtaining interim financing for the Series 2002 Project from Southwest Bank of Texas (the "Interim Lender") a portion of the proceeds of which will be used by the Trustee as security for the Series 2002 Bonds until the earlier of (a) the satisfaction of the conditions set forth in Section 521 hereof or (b) the Mandatory Escrow Termination Date (as defined herein); and

WHEREAS, all things necessary to make the Bonds, when authenticated by the Trustee and issued as provided in this Indenture, the valid and legally binding special and limited obligations

of the Issuer and to constitute this Indenture a valid and legally binding pledge and assignment of the trust estate herein made for the security of the payment of the principal of and interest on the Bonds issued hereunder, have been done and performed, and the execution and delivery of this Indenture and the execution and issuance of the Bonds, subject to the terms hereof, have in all respects been duly authorized;

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That the Issuer in consideration of the premises and the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Bonds by the Registered Owners thereof, and of the sum of one dollar, lawful money of the United States of America, to it duly paid by the Trustee at or before the execution and delivery of these presents, and for other good and valuable considerations, the receipt of which is hereby acknowledged, in order to secure the payment of the principal and redemption price of and interest on the Bonds according to their tenor and effect, and to secure the performance and observance by the Issuer of all the covenants expressed or implied herein and in the Bonds, does hereby grant, alienate, bargain, sell, convey, transfer, collaterally assign, grant a security interest in, and pledge unto the following (the "Trust Estate") to the Trustee and its successors in trust and assigns forever:

### GRANTING CLAUSE FIRST

Except for the Unassigned Rights, the Issuer's entire right, title and interest in and to each of the Borrower's Documents, specifically including the Issuer's right to receive payments from the Borrower under the Notes, the Mortgage and the Loan Agreement;

### GRANTING CLAUSE SECOND

The Issuer's entire right, title and interest in and to all Pledged Revenues; and

### GRANTING CLAUSE THIRD

All other real or personal property from time to time conveyed, pledged, assigned or transferred to the Trustee as additional security under this Indenture which property the Trustee is hereby authorized to receive;

There is, however, expressly excepted and excluded from the lien and operation of this Indenture amounts held by the Trustee in the Rebate Fund (as defined in the Loan Agreement);

TO HAVE AND TO HOLD all said property of every kind and description, real, personal, or mixed, hereby and hereafter (by supplemental indenture or otherwise) granted, bargained, sold, alienated, remised, released, conveyed, collaterally assigned, transferred, mortgaged, hypothecated, pledged, set over, or confirmed as aforesaid, or intended, agreed, or covenanted so to be, together with all the appurtenances thereto appertaining, and all amounts drawn thereunder (said properties and any cash and securities hereafter deposited or required to be deposited with

the Trustee (other than any such cash which is specifically stated herein not to be deemed part of the Trust Estate) unto the Trustee and its successors and assigns forever;

IN TRUST NEVERTHELESS, upon the terms and trusts herein set forth for the equal and ratable benefit, security, and protection of all present and future Registered Owners of the Bonds issued under and secured by this Indenture without privilege, priority, or distinction as to the lien or otherwise (except as herein expressly provided) of any of the Bonds over any of the other Bonds;

PROVIDED, HOWEVER, that if the Issuer, its successors or assigns, pays, causes to be paid or provides for the payment as permitted by this Indenture of the principal of, premium, if any, and interest on the Bonds at the times, in the manner and as otherwise provided by this Indenture and keeps, performs and observes all its covenants and agreements contained in this Indenture, then this Indenture and the rights hereby granted shall cease, determine and be void, otherwise to remain in full force and effect.

All the Bonds issued and secured under this Indenture are to be issued, authenticated and delivered and all property, rights and interests assigned and pledged under this Indenture are to be dealt with subject to the terms and conditions of this Indenture.

The Issuer agrees and covenants with the Trustee and with the Registered Owners of the Bonds, from time to time, as follows:

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION AND EXHIBITS

*Section 101.* *Definitions.* Capitalized terms used in this Indenture have the meanings that are attributed to them in Section 1.1 of the Loan Agreement unless the context clearly requires a different meaning.

*Section 102.* *Rules of Interpretation.* For purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a) The words "herein", "hereof" and "hereunder" and other similar words refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

(b) The definitions in this Article are applicable whether the terms defined are used in the singular or the plural.

(c) All accounting terms which are not defined in this Indenture have the meanings assigned to them in accordance with generally accepted accounting principles.

    (d)    Any pronouns used in this Indenture include both the singular and the plural and cover both genders.

    (e)    This Indenture is to be governed by the laws of the State.

    *Section 103.    Exhibits A and B - Forms of Bonds.* "*Exhibit A*" and "*Exhibit B*" attached to this Indenture, being the forms of the Series 2002 Bonds, are made a part of this Indenture.

    *Section 104.    Incorporation of Preamble.* The preambles hereto are hereby incorporated into, and made a part of this Indenture for all purposes.

## ARTICLE II

### THE BONDS

    *Section 201.    Limitation.* No Bonds may be issued under the provisions of this Indenture except in accordance with this Article.

    *Section 202.    The Series 2002 Bonds.* (a) The Series 2002 Bonds are authorized to be issued by this Section and designated "Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A" and "Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B". The Series 2002 Bonds shall be Outstanding in a total principal amount which is equal to the total principal amount of the Series 2002 Loan.

    (b)    The Series 2002 Bonds are:

        (i)    issuable as fully registered bonds without coupons;

        (ii)    issuable only in Authorized Denominations;

        (iii)    to be lettered and numbered R-1 upward for each respective Series of Bonds; and

        (iv)    to be dated the most recent Bond Interest Payment Date on which interest has been paid prior to the date on which it is authenticated, or, if authenticated prior to the first Bond Interest Payment Date, to be dated May 1, 2002.

    (c)    The proceeds from the sale of the Tax-Exempt Bonds shall be deposited as follows:

        (i)    All accrued interest paid in connection with the purchase of the Tax-Exempt Bonds shall be deposited into the Tax-Exempt Bonds Subaccount of the Capitalized Interest Subaccount of the Interest Account and shall be used solely for the purpose of paying interest on the Tax-Exempt Bonds on the first interest payment date;

(ii)    Capitalized Interest in the amount of $382,156.69 shall be deposited into the Tax-Exempt Bonds Subaccount of the Capitalized Interest Subaccount of the Interest Account and shall be used solely in connection with paying interest on the Tax-Exempt Bonds;

(iii)    An amount equal to the Reserve Requirement ($1,166,362.50) shall be deposited into the Debt Service Reserve Fund;

(iv)    (A) An amount equal to $11,764,740.00 shall be deposited into the Construction Account of the Project Fund and (B) of that amount, an amount equal to $9,200,000.00 shall be further deposited into the Contractor Subaccount of the Construction Account; and

(v)    An amount equal to $269,834.76 shall be deposited into the Issuing Expenses Account of the Project Fund and shall be used in connection with paying costs of issuance of the Series 2002 Bonds, including Underwriter's discount.

(d)    The proceeds from the sale of the Taxable Bonds shall be deposited as follows:

(i)    All accrued interest paid in connection with the purchase of the Taxable Bonds shall be deposited into the Taxable Bonds Subaccount of the Capitalized Interest Subaccount of the Interest Account and shall be used solely for the purpose of paying interest on the Taxable Bonds on the first interest payment date;

(ii)    Capitalized Interest in the amount of $15,447.05 shall be deposited into the Taxable Bonds Subaccount of the Capitalized Interest Subaccount of the Interest Account and shall be used solely in connection with paying interest on the Taxable Bonds;

(iii)    An amount equal to $5,000 shall be deposited into the Contingency Reserve Account of the Operation and Maintenance Fund;

(iv)    An amount equal to $116,500.00 shall be deposited into the Construction Account of the Project Fund; and

(v)    An amount equal to $333,052.95 shall be deposited into the Issuing Expenses Account of the Project Fund and shall be used in connection with paying costs of issuance of the Series 2002 Bonds.

*Section 203. Payment of the Series 2002 Bonds.* (a) Each Tax-Exempt Bond shall be dated as of May 1, 2002. Interest on the Tax-Exempt Bonds shall be payable on March 1 and September 1 of each year commencing September 1, 2002. Interest on the Tax-Exempt Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

The Tax-Exempt Bonds shall bear interest at the respective rates set forth in and shall mature on September 1 of each of the years set forth in and in the principal amount set forth opposite each year in the following schedule:

| MATURITY DATE (SEPTEMBER 1,) | INTEREST RATE | PRINCIPAL AMOUNT |
|---|---|---|
| 2013 | 6.375% | $1,170,000 |
| 2023 | 6.625% | 3,980,000 |
| 2033 | 6.750% | 8,835,000 |

(b)     Each Taxable Bond shall be dated as of May 1, 2002. Interest on the Taxable Bonds shall be payable on March 1 and September 1 of each year commencing September 1, 2002. Interest on the Taxable Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

The Taxable Bonds shall bear interest at the rate of 7.75% per annum and shall mature on September 1, 2009.

(c)     Payment of the principal of and premium, if any, at the maturity of any Series 2002 Bonds will be made to the Registered Owner at the Principal Corporate Trust Office of the Trustee or the principal office of any alternate paying agent subsequently appointed upon presentation and surrender of the Series 2002 Bonds to be paid. Payment of any installment of interest on any Series 2002 Bonds will be made to the Registered Owner by check or draft mailed to the Registered Owner at the Registered Owner's Address without the necessity of surrendering the Series 2002 Bonds on which payment is being made. All payments of principal, premium and interest on any Series 2002 Bonds will be made in lawful money of the United States of America. Such payments shall be deemed timely made if so mailed on the interest payment date, or, if such interest payment date is not a Business Day, then on the next succeeding Business Day.

Section 204.     Execution.     The Bonds are to be executed on behalf of the Issuer by the manual or facsimile signature of its County Executive under the seal of the Issuer attested by its County Clerk.

Upon the transfer, exchange or replacement of any Bonds pursuant to Section 210 or upon the partial redemption of any Bonds, the Issuer agrees that its County Executive and County Clerk will:

(a)     at the request of the Trustee, execute by their manual or facsimile signatures, any new Bonds as may be necessary and imprint or impress the seal of the Issuer on them; and

-7-

(b) at the request of the Trustee, execute and deliver to the Trustee a certificate satisfactory in form and substance to the Trustee as to their signatures and incumbencies.

The signature of the person who was County Executive or County Clerk at the time the Bonds were signed or sealed is valid and sufficient for all purposes even though that person is not County Executive or County Clerk on the date of the Bonds or on the date any Bonds are delivered.

*Section 205. Limited Obligation.* PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS IS A LIMITED OBLIGATION OF THE ISSUER PAYABLE SOLELY FROM AND SECURED BY THE TRUST ESTATE HELD BY THE TRUSTEE. THE TRUSTEE AGREES TO HOLD THE TRUST ESTATE AND APPLY THE MONEYS DERIVED THEREFROM ONLY AS PROVIDED IN THIS INDENTURE. THE BONDS DO NOT CONSTITUTE A DEBT OF THE ISSUER OR A LOAN OR CREDIT EXTENDED TO THE ISSUER WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION AND SHALL NOT CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE ISSUER OR A CHARGE AGAINST ITS GENERAL CREDIT OR TAXING POWERS.

*Section 206. Authentication.* No Bond is valid or entitled to any security or benefit under this Indenture unless a certificate of authentication on the Bond, substantially in the form set forth in *"Exhibit A,"* has been signed by the Trustee. An executed certificate of authentication on any Bond is conclusive evidence that the Bond has been authenticated and delivered under this Indenture. The Trustee's certificate of authentication is to be signed by an authorized signatory of the Trustee. It is not necessary that the same person sign the certificate of authentication on all of the Bonds.

*Section 207. Form of Bonds.* The Bonds issued under this Indenture are to be substantially in the form set forth in *"Exhibit A"* and *"Exhibit B"*, respectively, with variations, omissions and insertions as are permitted or required by this Indenture or deemed necessary by the Trustee. Any portion of the text of a Bond may be set forth on its reverse side with an appropriate reference on the face of the Bond. The Bonds may be printed, engraved or typewritten.

*Section 208. Delivery of Bonds.* Upon the execution and delivery of this Indenture, the Issuer will execute and deliver the Series 2002 Bonds to the Trustee and the Trustee will authenticate and deliver the Series 2002 Bonds to the Purchaser as directed by the Issuer.

Prior to the authentication and delivery of the Series 2002 Bonds by the Trustee, the following documents must be delivered to the Trustee:

(a) a certified copy of the Authorizing Ordinance;

(b) an original executed counterpart of the Loan Agreement and this Indenture;

-8-

(c)    the executed Note No. 1 and an original executed counterpart of the Mortgage;

(d)    a written certificate of the Issuer, signed by the County Executive or County Clerk of the Issuer, requesting and authorizing the Trustee to authenticate the Series 2002 Bonds and to deliver them to the initial purchaser in exchange for payment to the Trustee for the account of the Issuer of the purchase price specified in the Issuer's certificate which amount, upon receipt, the Trustee agrees to deposit as provided in Section 202(c) hereof;

(e)    an opinion of Bond Counsel to the effect that (i) the Issuer has full power and authority to issue the Series 2002 Bonds, (ii) the Issuer has properly adopted the Authorizing Ordinance, (iii) the Series 2002 Bonds have been authorized, executed, delivered and issued and are valid and legally binding limited obligations of the Issuer subject to normal exceptions for bankruptcy matters and the availability of equitable remedies and (iv) under existing statutes, regulations, rulings and judicial decisions, the interest on the Tax-Exempt Bonds is excluded from gross income for purposes of present federal income taxes;

(f)    a certificate of the Borrower and the Issuer to the effect that it is not expected that the proceeds of the Tax-Exempt Bonds will be used in a manner that would cause the Tax-Exempt Bonds to be "Arbitrage Bonds" under Section 148 of the Code; and

(g)    an appropriate resolution of the board of directors of the Borrower authorizing the execution and delivery of the Borrower's Documents.

Section 209.   *Mutilated, Lost, Stolen or Destroyed Bonds.*   If any Bonds are mutilated, lost, stolen or destroyed, the Issuer agrees to execute as provided in Section 204 and the Trustee agrees to authenticate and deliver new Bonds of like date, maturity and denomination as those mutilated, lost, stolen or destroyed. In the case of a mutilated Bond, the mutilated Bond must be surrendered to the Trustee in exchange for the new Bond. In the case of a lost, stolen or destroyed Bond, there must be furnished to the Trustee evidence of the loss, theft or destruction satisfactory to the Trustee and indemnity satisfactory to the Trustee before the new Bonds are delivered. If any mutilated, lost, stolen or destroyed Bond has matured the Trustee, upon the surrender of a mutilated Bond or upon receipt of the evidence and indemnity referred to above in the case of a lost, stolen or destroyed Bond, may pay the Bond instead of issuing a replacement. The Issuer and the Trustee may charge the Registered Owner of a mutilated, lost, stolen or destroyed Bond with their reasonable fees and expenses in this connection.

Any new Bond issued under the provisions of this Section which replaces a mutilated, lost, stolen or destroyed Bond constitutes an original contractual obligation of the Issuer and is entitled to the benefits and is subject to the restrictions of this Indenture to the same extent as the Bond replaced.

*Section 210.   Registration, Transfer and Exchange of Bonds.* The Trustee is appointed the bond registrar of the Issuer for the purpose of registering, transferring, exchanging and replacing Bonds. The Trustee agrees to keep the Registration Books.

At reasonable times and under reasonable regulations established by the Trustee, the Registration Books may be inspected and copied by the College, the Borrower or by any Registered Owner (or legal representative thereof) of 25% or more in principal amount of the Bonds of a series then Outstanding at the expense of such person.

Any Bond may be transferred, upon its presentation at the Principal Corporate Trust Office of the Trustee if it has been duly endorsed for transfer or is accompanied by a written instrument of transfer satisfactory to the Trustee which has been executed by the Registered Owner. The Trustee will transfer any Bond so presented by making an appropriate entry in the Registration Books and delivering to the transferee(s) one or more new Bonds which have been executed by the Issuer, have been authenticated by the Trustee, are in an Authorized Denomination and have the same form, terms, interest rate, maturity and aggregate principal amount as the Bond being transferred.

Bonds of a series may be exchanged for other Bonds of the same series by surrendering the Bonds to be exchanged at the Principal Corporate Trust Office of the Trustee. The Trustee will exchange any Bond so presented by making an appropriate entry in the Registration Books and delivering to the Registered Owner presenting the Bonds for exchange one or more new Bonds which have been executed by the Issuer, have been authenticated by the Trustee, are in Authorized Denominations and have the same form, terms, interest rate, maturity and aggregate principal amount as the Bond being exchanged.

The Issuer agrees to execute as provided in Section 204 and deliver to the Trustee and the Trustee agrees to authenticate and deliver to the person entitled to delivery the Bonds which the Registered Owner requesting the transfer or exchange is entitled to receive. The Registered Owner requesting any transfer or exchange of any Bonds must pay, as a condition to the transfer or exchange, any resulting tax or other governmental charge and the reasonable fees and expenses of the Trustee and the Issuer.

The Trustee is not required to register, transfer, exchange or replace any Bonds (a) during the 15-day period immediately preceding an interest payment date on the Bonds, or in the case of any proposed redemption of Bonds, then during the 45 days prior to the proposed date of redemption for any particular Bond or (b) after a Bond has been called for redemption.

*Section 211.   Cancellation of Bonds.* (a) Any Outstanding Bonds delivered to the Trustee (i) for cancellation pursuant to Section 211(b) or as otherwise provided in this Indenture, or (ii) for redemption and which have been redeemed will be promptly canceled by the Trustee. Counterparts of a certificate of cancellation evidencing any cancellation under this Section will be furnished by the Trustee to the Issuer and the Borrower.

(b)   An acquisition of Bonds by the Borrower or the Trustee for its own account does not operate as a redemption or satisfaction of the indebtedness represented by the acquired Bonds

unless and until they are delivered to the Trustee by the Borrower for cancellation. The Borrower has the option at any time and from time to time to deliver Bonds owned by it to the Trustee for cancellation.

Section 212. *Temporary Bonds.* Pending the preparation of definitive Bonds, the Issuer may execute and the Trustee may authenticate and deliver temporary Bonds which are typewritten and copied or otherwise reproduced and are substantially in the form provided in *"Exhibit A"* or *"Exhibit B"*, respectively. If temporary Bonds are issued, the Trustee will have definitive Bonds prepared without unreasonable delay. When definitive Bonds are available, the temporary Bonds are exchangeable for definitive Bonds without charge upon surrender of the temporary Bonds at the Principal Corporate Trust Office of the Trustee. Upon surrender for cancellation of any temporary Bonds, the Issuer will execute and the Trustee will authenticate and deliver in exchange for the temporary Bonds a like principal amount of definitive Bonds of Authorized Denominations. Until exchanged, the temporary Bonds are entitled to the same benefits under this Indenture as definitive Bonds and the principal of, premium, if any, and interest on the Bonds, when and as payable, will be paid to the Registered Owners of the temporary Bonds.

Section 213. *Issuance of Additional Bonds.* (a) With the prior written consent of the College, Additional Bonds may be authenticated and delivered from time to time to the extent permitted by law and as provided by Supplemental Indenture:

      (i)    to refund or to advance refund one or more series of Bonds, in whole or in part ("Refunding Purposes");

      (ii)    to finance (a) the additional cost or estimated additional cost of completing the construction, furnishing and equipping of the Series 2002 Project or (b) the cost or estimated cost of acquiring, constructing, furnishing and equipping additional student housing facilities for the benefit of the College ("Construction Purposes"); provided that, as a condition to the issuance of any such Additional Bonds for Construction Purposes:

      (a)    the Borrower's Net Revenues of the Projects (which includes Net Revenues from the Series 2002 Project and any additional improvements financed with Additional Bonds) for the last completed Fiscal Year, as reflected in the audited financial statements delivered by the Borrower pursuant to the Loan Agreement, must have been not less than 130% of the Debt Service Requirement with respect to all Outstanding Bonds for such Fiscal Year; and

      (b)    the sum of the Borrower's Net Revenues of the Projects for the last completed Fiscal Year, as determined as provided in (a) above, plus any projected additional Net Revenues of the Projects to be derived from the proposed project during the first full Fiscal Year after such project is placed in service, as reflected in a report of a nationally-recognized independent feasibility consultant, must be not less than 130% of the Maximum Annual Debt Service Requirement in any future Fiscal Year with respect to all Outstanding Bonds and the Additional Bonds to be issued.

In each case, the Additional Bonds may include additional funds to pay the costs to be incurred in connection with the issuance of the Additional Bonds, to establish reserves with respect to them and to pay interest during the estimated construction period, if any. Each series of Additional Bonds issued under this Indenture must be equal in aggregate principal amount to the principal amount of the Additional Note being delivered in connection with the Additional Bonds.

(b)     All Additional Bonds rank equally and ratably with the Series 2002 Bonds, but will bear the date or dates, bear the interest rate or rates, mature in the amount or amounts and on the date or dates will have the optional or mandatory redemption features, and be sold at the prices as are provided in the supplement to this Indenture providing for the Additional Bonds and as is approved in writing by the Issuer and the Borrower.

(c)     Prior to the delivery by the Issuer of any of the Additional Bonds there must be filed with the Trustee the following:

(i)     a supplement to this Indenture executed by the Issuer and the Trustee creating the Additional Bonds, specifying their terms, pledging and assigning the Additional Note being delivered in connection with the Additional Bonds as security for them and providing for the disposition of the proceeds of their sale, and further reciting that all of the covenants herein contained will be applicable to such Additional Bonds;

(ii)     the supplements to the Loan Agreement and the other instruments, documents, certificates and opinions referred to in Section 7.2 of the Loan Agreement;

(iii)     the Additional Note being acquired in connection with the Additional Bonds, made payable to the order of the Issuer, duly executed by the Borrower;

(iv)     a copy, certified by the County Executive or County Clerk of the Issuer, of the resolution or ordinance adopted by the Issuer authorizing the execution and delivery of the supplements to the Indenture and the Loan Agreement and the issuance of the Additional Bonds;

(v)     an Officer's Certificate of the Issuer requesting the Trustee to authenticate and deliver the Additional Bonds and stating that the Issuer shall not be in default in performing any of the covenants and obligations assumed hereunder, and all payments herein required to have been made into the accounts and funds, as provided hereunder, shall have been made to the full extent required;

(vi)     unless the Reserve Requirement for an issue of Additional Bonds shall be funded in a separate sub-account of the Debt Service Reserve Fund solely for such issue, the Reserve Requirement required to be on deposit in the Debt Service Reserve Fund as a result of the issuance of such Additional Bonds shall be satisfied on the date of issuance thereof, either with cash or a Reserve Account Insurance Policy;

(vii)    a written certificate of the Issuer, signed by the County Executive or County Clerk, requesting and authorizing the Trustee to authenticate the Additional Bonds and to deliver them to the initial purchaser in exchange for payment to the Trustee for the account of the Issuer of the purchase price thereof;

(viii)    an opinion of Bond Counsel to the effect that (i) the Issuer has full power and authority to issue the Additional Bonds, (ii) the Issuer has properly adopted the Authorizing Ordinance, (iii) the Additional Bonds have been authorized, executed, delivered and issued and are valid and legally binding limited obligations of the Issuer subject to normal exceptions for bankruptcy matters and the availability of equitable remedies and (iv) the issuance of such Additional Bonds will not adversely affect the exclusion of the interest on the Tax-Exempt Bonds from gross income for purposes of federal income taxes;

(ix)    a certificate of the Borrower and the Issuer to the effect that it is not expected that the proceeds of the Additional Bonds will be used in a manner that would cause the Additional Bonds to be "Arbitrage Bonds" under Section 148 of the Code;

(x)    an appropriate resolution of the board of directors of the Borrower authorizing the execution and delivery of the various agreements and instruments to be entered into by the Borrower in connection with the issuance of the Additional Bonds;

(xi)    the written consent of the College to the issuance of such Additional Bonds; and

(xii)    confirmation from (a) each Rating Agency then rating the Series 2002 Bonds that its rating of the Series 2002 Bonds is at least "investment grade" (as defined by such Rating Agency), after giving effect to the issuance of such Additional Bonds, and (b) any Rating Agency that it will rate such Additional Bonds at least "investment grade" (as defined by such Rating Agency).

(d)    As provided in Section 7.1 of the Loan Agreement, the Borrower may issue Additional Notes in connection with the issuance of Additional Bonds for the purposes and to the extent specified therein.

*Section 214.    Registered Owners Treated as Registered Owners.*  Except as set forth in Section 215 of this Indenture, the Issuer and the Trustee may treat the Registered Owner of any Series 2002 Bond as its absolute Registered Owner (whether or not the Series 2002 Bond or the interest thereon is overdue) for all purposes, other than for the purpose of receiving payments of interest due on the Series 2002 Bonds and may deem and treat the Registered Owner of each Series 2002 Bond as of the immediately preceding Record Date as the absolute owner of each Series 2002 Bond for the purpose of receiving payments of interest on the Series 2002 Bonds. Neither the Issuer nor the Trustee is affected by any notice to the contrary

*Section 215    Book-Entry-Only System.*  The Bonds shall be initially issued in the form of a separate single fully registered Bond for each maturity. Upon initial issuance, the ownership of

each such Bond shall be registered in the Registration Books in the name of Cede & Co., as nominee of DTC, and except as hereinafter provided, all of the outstanding Bonds shall be registered in the Registration Books in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered on the Registration Books in the name of Cede & Co., as nominee of DTC, the Issuer, the Borrower and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the Issuer, the Borrower and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in any Bond, (ii) the delivery to any DTC Participant or any other Person, other than a Bondholder, as shown on the Registration Books, of any notice with respect to any Bonds, including without limitation any notice of redemption, or (iii) the payment to any DTC Participant or any other Person, other than a Bondholder, as shown on the Registration Books, of any amount with respect to principal of, premium, if any, or interest on any Bond. Notwithstanding any other provision of this Indenture to the contrary, the Issuer, the Trustee and each other Paying Agent, if any, shall be entitled to treat and consider the Person in whose name each Bond is registered on the Registration Books as the absolute owner of such Bond for the purpose of payment of principal, premium, if any, and interest with respect to such Bond, for the purpose of giving notices of redemption, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee and each other Paying Agent, if any, shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondholders, as shown on the Registration Books as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the Issuer's obligations with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondholder, as shown on the Registration Books, shall receive a Bond certificate evidencing the obligation of the Issuer to make payments of principal, premium, if any, and interest pursuant to this Indenture.

The Bondholders have no right to a depository for the Bonds. The Issuer or the Trustee may remove DTC or any successor thereto for any reason at any time. DTC may determine to discontinue providing its services with respect to the Bonds at any time by giving notice to the Trustee and the Borrower and discharging its responsibilities. The Trustee shall notify the Issuer of such discontinuation of DTC's services. In such event, the Issuer shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities and Exchange Act of 1934, as amended, notify DTC of the appointment of such successor securities depository and transfer or cause the transfer of one or more separate Bond certificates to such successor securities depository or (ii) notify DTC of the availability through DTC of Bond certificates and transfer or cause the transfer of one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered on the Registration Books in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names the DTC Participants receiving Bonds shall designate, in accordance with the provisions of this Indenture.

Notwithstanding any other provision of this Indenture, so long as DTC, or its designee, is the registered owner of all Bonds, the provisions set forth in the Letter of Representations (the "Letter of Representations") between the Issuer, the Trustee and DTC shall apply to the redemption of any Bonds and to the payment of principal of and interest on the Bonds, including without limitation, that:

      (a)    presentation of Bonds to the Trustee upon redemption or at maturity shall be deemed made to the Trustee when the right to exercise ownership rights in the Bonds through DTC or DTC's Participants is transferred by DTC on its books; and

      (b)    DTC may present notices, approvals, waivers or other communications required or permitted to be made by Bondholders under this Indenture on a fractionalized basis on behalf of some or all of those persons entitled to exercise ownership rights in the Bonds through DTC or DTC's Participants.

So long as the Bonds are registered in the name of Cede & Co., as nominee of DTC, the Trustee agrees to comply with the terms and provisions of the Letter of Representations attached hereto as "*Exhibit C*" and by this reference made a part hereof.

## ARTICLE III

### REDEMPTION OF BONDS BEFORE MATURITY

*Section 301.*    *Redemption Generally.* The Series 2002 Bonds may not be redeemed prior to their maturity except as provided in this Article.

*Section 302.*    *Events Permitting or Requiring Redemption of the Series 2002 Bonds.* The Series 2002 Bonds are callable for redemption upon the occurrence of any of the events, at the times, in the manner, at the redemption prices, with the notice and otherwise as provided in *"Exhibit A"* or *"Exhibit B"*, respectively.

*Section 303.*    *Redemption Notice.* The Trustee agrees to give notice not less than 30 days nor more than 60 days prior to the date of redemption of any redemption as provided in *"Exhibit A"* and *"Exhibit B"*, respectively, except that notice of a Special Redemption (as defined in Exhibit A and Exhibit B) occurring as a result of the failure to meet conditions for disbursement of moneys from the Escrow Fund shall be given not less than 14 days prior to the date fixed for such redemption. Failure to give a Redemption Notice or a defect in it does not affect (a) the validity of any proceedings for the redemption of a Bond if the Registered Owner of it receives actual notice of the redemption from any source or (b) the validity of the proceedings for the redemption of any Bonds for which proper notice was given. The Trustee also agrees that a copy of each Redemption Notice will also be sent, by first class mail, to the registered securities depositories and national information services that disseminate redemption notices as the Trustee determines to be customary or appropriate.

*Section 304. Redemption Payments.* If the Bonds are to be called for redemption, in whole or in part, the Loan Agreement requires the Borrower to deposit with the Trustee funds sufficient to pay the redemption price when due on the date specified on notice from the Trustee to the Borrower. The Trustee is authorized and directed to apply those funds to the payment of the Bonds to be redeemed. Interest on any Bonds or portions of them called for redemption stops accruing on the date the Redemption Notice fixes for their redemption if (a) notice of their redemption has been given as provided in this Indenture or if the Registered Owner is deemed to have notice as provided in Section 303 and (b) money sufficient for their payment is on deposit with the Trustee as required by this Indenture. No payment will be made by the Trustee on any Bond called for redemption until the Bond has been surrendered to the Trustee at its Principal Corporate Trust Office for payment and cancellation or the Trustee has received the items required by Section 209 with respect to any mutilated, lost, stolen or destroyed Bond. Redemption payments will be accompanied with the CUSIP numbers of the Bonds being redeemed.

*Section 305. Selection of Bonds to be Redeemed.* In the event of any redemption of the Bonds in part, the Bonds to be redeemed shall be selected in the order of maturity specified by the Borrower as described in Article VI of the Loan Agreement, and within each maturity by lot in such manner as the Trustee shall determine.

## ARTICLE IV

## GENERAL COVENANTS

*Section 401. Issuer's Covenants.* The Issuer covenants that:

   (a)   it will promptly pay or cause to be paid from the Bond Fund the principal of, premium, if any, and interest on every Bond issued under this Indenture at the place, on the dates, from the sources and in the manner provided in this Indenture and in the Bonds,

   (b)   it will perform its obligations under the Loan Agreement, this Indenture, any Bonds executed, authenticated and delivered under this Indenture and all of its proceedings relating to the issuance of the Bonds,

   (c)   it will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, any supplemental indentures and any further acts, instruments and transfers as the Trustee may reasonably require for the better assuring, transferring, conveying, pledging, assigning, perfecting and confirming unto the Trustee the rights assigned and pledged by this Indenture to the payment of the principal of, premium, if any, and interest on the Bonds,

   (d)   so long as any of the Bonds are Outstanding it will deposit, or cause to be paid to the Trustee for deposit in the Bond Fund for its account, but solely from the Gross

Revenues, amounts to promptly pay the principal of, premium, if any, and interest on the Bonds as it becomes due and payable,

(e)    should there be a Default or an Event of Default under the Loan Agreement, it will fully cooperate with the Trustee and with the Registered Owners to the end of fully protecting the rights and security of the Registered Owners,

(f)    it will execute any financing statements and other security instruments relating to security for the Bonds and will cooperate with the Trustee in the recording and filing of them in the manner and in places as may be required by law in order to fully preserve and protect the security of the Registered Owners and the rights of the Trustee and to perfect the security interest and lien created by this Indenture, and

(g)    all books and documents in its possession relating to the Project and the revenues derived from the Project will be open to inspection by the Trustee, the Borrower or the agents designated by either of them from time to time.

*Section 402.    Rights Under Loan Agreement.*    The Loan Agreement, an executed counterpart of which has been filed with the Trustee, sets forth the covenants and obligations of the Issuer and the Borrower. The Issuer agrees that the Trustee in its name or in the name of the Issuer may enforce all rights of the Issuer other than the Unassigned Rights and all obligations of the Borrower under the Loan Agreement on behalf of the Registered Owners, whether or not the Issuer is in default under this Indenture or the Loan Agreement.

*Section 403.    Reserved.*

*Section 404.    Designation of Additional Paying Agents.*    The Issuer agrees that it will, as necessary, make arrangements through the Trustee for the designation of alternate paying agents and for making funds available under this Indenture for the payment of Bonds by any alternate paying agents.

### ARTICLE V

### REVENUES AND FUNDS

*Section 501.    Creation of Pledged Revenue Fund.*    There is created by this Section by the Issuer and established with the Trustee a trust fund designated "Foundation Housing, LLC Pledged Revenue Fund" (the "Pledged Revenue Fund"). Within the Pledged Revenue Fund are created the following Accounts:

(a)    the Revenue Account; and

(b)    the Security Deposit Account.

-17-

The Pledged Revenue Fund is to be used as provided in Section 505 and otherwise in accordance with this Indenture.

Section 502. *Creation of the Bond Fund.* There is created by this Section by the Issuer and established with the Trustee a trust fund designated "Foundation Housing, LLC Bond Fund" (the "Bond Fund"). Within the Bond Fund are created the following Accounts:

      (a)    the Principal Account;

      (b)    the Interest Account, and within the Interest Account, a Capitalized Interest Subaccount, and within the Capitalized Interest Subaccount, a Tax-Exempt Bonds Subaccount and a Taxable Bonds Subaccount; and

      (c)    the Prepayment Account.

There shall also be created within the Bond Fund such Bond Amortization Accounts with respect to Term Bonds as shall be directed by instructions from the Borrower subject to any applicable mandatory redemption provisions. The Bond Fund is to be used as provided in Section 507 and otherwise in accordance with this Indenture.

Section 503. *Creation of the Project Fund.* There is created by this Section by the Issuer and established with the Trustee a trust fund designated the "Foundation Housing, LLC Project Fund" (the "Project Fund"). Within the Project Fund are created the following Accounts and Subaccounts:

      (a)    the Construction Account, and within such Construction Account a subaccount to be known as the Contractor Subaccount;

      (b)    the Issuing Expenses Account;

      (c)    the Management Fees Account; and

      (d)    the Net Proceeds Account.

The Project Fund is to be used as provided in Article IV and Article VIII of the Loan Agreement and otherwise in accordance with Section 509 of this Indenture.

Section 504. *Payments into the Pledged Revenue Fund.* (a) The Trustee shall deposit into the Revenue Account:

      (i)    all Pledged Revenues except those attributable to Security Deposits as certified by the Borrower or the Manager;

      (ii)    investment earnings on the Revenue Account; and

(iii)    all amounts which are required by other provisions of this Indenture to be transferred to the Revenue Account.

(b)    The Trustee shall deposit into the Security Deposit Account:

(i)    all amounts received by the Manager and delivered to the Trustee as Security Deposits;

(ii)    investment earnings on the Security Deposit Account; and

(iii)    all amounts which are required by other provisions of this Indenture to be transferred to the Security Deposit Account.

(c)    The Trustee shall receive the Pledged Revenues through the following procedure:

(i)    the Borrower shall establish one or more depository accounts ("Depository Accounts") at a banking institution in Will County, Illinois, provided that: (aa) such accounts shall be in the name of the Trustee; (bb) pursuant to the terms of such accounts, withdrawals may only be transferred to the Pledged Revenue Fund and the Security Deposit Fund, as appropriate; and (cc) the transferable balances in the depository accounts, excluding any amounts required for the payment of fees and charges imposed by the banking institution at which such accounts are maintained and excluding the amount of any deposits for which the payment checks have not been confirmed to be supported by good and available funds, are transferred to the appropriate account within the Pledged Revenue Fund at least weekly;

(ii)    the Borrower shall cause the Manager to deposit all Gross Revenues described in clause (a) of the definition of "Gross Revenues" into such Depository Accounts no less frequently than daily;

(iii)    in the event that a separate Depository Account is not maintained for Security Deposits, the Borrower shall cause the Manager to designate in writing which amounts in the Depository Accounts are attributable to Security Deposits; and

(iv)    the Trustee shall transfer all available funds in the Depository Accounts to the appropriate accounts within the Pledged Revenue Funds no less frequently than weekly.

*Section 505.    Use of Money in Pledged Revenue Fund.* (a) Except as otherwise provided in this Indenture, money in the Revenue Account will be used as provided in the flow of funds in Section 520 of this Indenture. The Issuer authorizes and directs the Trustee on the fifteenth day of each month, or if the fifteenth day is not a Business Day, the next succeeding Business Day, to withdraw funds from the Revenue Account to effectuate all the transfers of funds contemplated by Section 520 of this Indenture. The Trustee agrees to do so.

(b)    Except as otherwise provided in this Indenture, money in the Security Deposit Account will be used, upon written instruction of the Manager, to (i) return to tenants or to be applied to repairs of the Series 2002 Project in accordance with the terms of the leases relating to the Series 2002 Project in accordance with such instructions or (ii) transferred to the Revenue Account to the extent forfeited by the tenants under the leases relating to the Series 2002 Project as instructed from time to time by the Manager. The Issuer authorizes and directs the Trustee to withdraw sufficient funds from the Security Deposit Account to fulfill the terms of the leases relating to the Series 2002 Project as instructed from time to time by the Borrower or the Manager. The Trustee agrees to do so promptly after receipt of such instructions.

(c)    Investment earnings on amounts in the Security Deposit Account shall be transferred to the Revenue Account on the last day of each Fiscal Year.

*Section 506.    Payments into the Bond Fund.* (a) The Trustee shall deposit into the Interest Account:

(i)    the Accrued Interest and the Capitalized Interest received at the time of the issuance and delivery of the Bonds shall be deposited into the Tax-Exempt Bonds Subaccount (with respect to proceeds of the Tax-Exempt Bonds) and the Taxable Bonds Subaccount (with respect to the proceeds of the Taxable Bonds) of the Capitalized Interest Subaccount;

(ii)    investment earnings on the Interest Account (investment earnings on the Capitalized Interest shall be retained in the respective Subaccount of the Capitalized Interest Subaccount);

(iii)    from the Revenue Account, all amounts attributable to interest on the Bonds as calculated in instructions in writing by the Borrower; and

(iv)    all amounts which are required by other provisions of this Indenture to be transferred to the Interest Account.

(b)    The Trustee shall deposit into the Principal Account:

(i)    from the Revenue Account, all amounts attributable to principal on the Bonds as calculated in instructions in writing by the Borrower;

(ii)    investment earnings on the Principal Account; and

(iii)    all amounts which are required by other provisions of this Indenture to be transferred to the Principal Account.

(c)    The Trustee shall deposit into the Prepayment Account:

(i)    all amounts received from the Borrower which, as specified in writing by the Borrower to the Trustee, represent a prepayment of the principal of the Notes

-20-

permitted by Article VI of the Loan Agreement, and which are permitted to be used to redeem Bonds by Article III of this Indenture, and any premium required in connection with a prepayment or redemption; and

    (ii)    investment earnings on the Prepayment Account.

*Section 507.*   *Use of Money in the Bond Fund.* (a) Except as otherwise provided in this Indenture and subject to the requirements of Section 507(c) hereof, money in the Interest Account will be used in connection with the payment of the interest on the Bonds as it becomes due as provided in Section 522 hereof. The Issuer authorizes and directs the Trustee on each Bond Interest Payment Date to apply funds in the Interest Account to pay such interest on the Bonds according to Article II of this Indenture. The Trustee agrees to do so. If three days prior to a Bond Interest Payment Date there is not enough money in the Interest Account to make all the required payments, the Trustee shall transfer money to the Interest Account, three days prior to such Bond Interest Payment Date, first, from the available amounts in the Revenue Account as allocated according to Section 520 of this Indenture, second from the Management Fees Account of the Project Fund, third from the Debt Service Reserve Fund, fourth from the Prepayment Account, fourth from the Operating Reserve Fund, fifth from the Replacement Fund, and sixth from the Principal Account. Moneys in the Tax-Exempt Bonds Subaccount of the Capitalized Interest Subaccount shall be applied only to pay interest on the Tax-Exempt Bonds; and moneys in the Taxable Bonds Subaccount of the Capitalized Interest Subaccount shall be applied only to pay interest on the Taxable Bonds.

(b)    Except as otherwise provided in this Indenture, money in the Principal Account will be used first, to make up deficiencies in the Interest Account (after transfers thereto from the Revenue Account, Debt Service Reserve Fund, Prepayment Account, Operating Reserve Fund and Replacement Fund) and second, for the payment of and premium, if any, on the Bonds as it becomes due whether at maturity, redemption, acceleration or otherwise. The Issuer authorizes and directs the Trustee on each Bond Principal Payment Date to withdraw funds from the Principal Account to pay those amounts when due according to Article II of this Indenture after giving effect to the transfer requested under Section 507(a) hereof. The Trustee agrees to do so. If three days prior to such Bond Principal Payment Date there is not enough money in the Principal Account to make all the required payments, the Trustee shall transfer, three days prior to such Bond Principal Payment Date, sufficient money for such purpose first, from the available amounts in the Revenue Account as allocated according to Section 520 of this Indenture, second, from the Management Fees Account of the Project Fund, third from the Debt Service Reserve Fund, fourth, from the Prepayment Account, fifth, from the Operating Reserve Fund and sixth, from the Replacement Fund.

(c)    [Reserved]

(d)    Money in the Prepayment Account will be used first, to make up any deficiencies existing in the Interest Account after transfers thereto from the Revenue Account and the Debt Service Reserve Fund; second, to make up any deficiencies in the Principal Account; and third, for the payment of the principal of and premium, if any, on Bonds called for redemption as

-21-

provided in "Exhibit A" or "Exhibit B", respectively. The Issuer authorizes and directs the Trustee to transfer to the Principal Account amounts on deposit in the Prepayment Account one Business Day prior to the day it is needed for that purpose. The Trustee shall follow the redemption provisions and notice provisions outlined in Article III of this Indenture. Money on deposit in the Prepayment Account which is not needed to pay the principal of or premium if any, on Bonds called for redemption may be used by the Trustee to purchase Bonds in the open market for cancellation if the Trustee is requested in writing to do so by the Borrower.

(e)     Whenever the amount in the Bond Fund from any source is sufficient to pay the principal of, unpaid interest which has accrued on the Bonds and will accrue through the date the Bonds are redeemed and any redemption premiums on all the Bonds then Outstanding, the Trustee, upon the written request of the Borrower, is instructed and agrees to take or cause to be taken the necessary steps to pay or redeem all of the Bonds then Outstanding on the next date on which all of the Bonds may be redeemed and for which the required redemption notice may be given.

(f)     Upon the issuance of any Additional Bonds under the terms, limitations and conditions as are herein provided, the payments into the several accounts in the Bond Fund shall be increased in such amounts as shall be necessary to make the payments for the principal of, interest on and reserves for such Additional Bonds and, if Term Bonds are issued, the Amortization Installments, on the same basis as hereinabove provided with respect to the Bonds initially issued under this Indenture.

Section 508.     *Payments into the Project Fund.* The Trustee will, upon receipt, deposit the following amounts in the designated accounts of the Project Fund:

(a)     the proceeds of the issuance and sale of the Series 2002 Bonds described in Section 202(c)(iv) and Section 202(d)(iv) hereof are to be deposited into the Construction Account, and into the Contractor Subaccount therein the amount described in Section 202(c)(iv)(B) hereof;

(b)     the proceeds of the issuance and sale of the Series 2002 Bonds described in Section 202(c)(v) hereof and Section 202(d)(v) hereof are to be deposited into the Issuing Expenses Account;

(c)     Management Fees are to be deposited into the Management Fees Account from time to time as provided in Section 520(a)(ix) and Section 520(b)(viii) hereof; and

(d)     Net Proceeds, as calculated by the Borrower in writing, will be deposited in the Net Proceeds Account.

Section 509.     *Use of Money in the Project Fund.* (a) Subject to the requirements of Section 509 (h) hereof, money in the Issuing Expenses Account will be used in connection with the payment of Issuing Expenses or the reimbursement to the Borrower for Issuing Expenses actually paid by it as provided herein and in Section 522 hereof. The Issuer authorizes and directs the Trustee from time to time to transfer sufficient funds from the Issuing Expenses Account to

the Escrow Fund in connection with the payment of Issuing Expenses under Section 4.3 of the Loan Agreement. The payment or reimbursement of Issuing Expenses will be provided for by the Trustee pursuant to Section 522 hereof upon receipt by the Trustee of a written request signed by the Authorized Borrower Representative which identifies the Issuing Expenses for which payment or reimbursement is due and gives the name and address of, and amount due to, that Person. Upon receipt of a Borrower's Certificate to the effect that all Issuing Expenses have been paid and that the Borrower has been reimbursed for all Issuing Expenses paid by it, amounts then on deposit in the Issuing Expenses Account will be transferred to the Construction Account and the Issuing Expenses Account closed.

(b) Subject to the requirements of Section 509(c) hereof and of Section 509(h) hereof, money in the Construction Account will be used in connection with the payment of Project Costs as provided herein and in Section 522 hereof. The payment of Project Costs will be provided for by the Trustee and the Interim Lender pursuant to Section 522 hereof upon receipt by the Trustee and the Interim Lender of a written Requisition substantially in the form attached as "Exhibit D" to the Loan Agreement signed by the Authorized Borrower Representative, and approved by the Vice President for Business Services or Vice President for Student Services of the College, which identifies the Project Costs for which payment is due and gives the name and address of, and amount due to, that Person. All investment earnings on the Construction Account shall be transferred, as and when received, to the Interest Account to be applied to pay interest on the Series 2002 Bonds.

(c) With respect to Project Costs that are also Contractor Costs and subject to the requirements of Section 509(g) hereof, money in the Contractor Subaccount will only be used in connection with the payment of Contractor Costs as provided herein and in Section 522 hereof. The payment of Contractor Costs will be provided for by the Trustee and the Interim Lender pursuant to Section 522 hereof upon receipt by the Trustee and the Interim Lender of a written Requisition substantially in the form attached as "Exhibit D" to the Loan Agreement signed by the Authorized Borrower Representative, and approved by the Vice President for Business Services or Vice President for Student Services of the College, which (i) identifies the Contractor Costs for which payment is due and gives the name and address of, and amount due to, that Person, and (ii) until the Borrower and the Contractor both certify in writing to the Trustee that all Contractor Costs have been paid in full, any Requisition for funds from the Contractor Subaccount must include the Borrower's certification that such funds will be used solely to pay Contractor Costs. All investment earnings on the Contractor Subaccount shall be transferred, as and when received, to the Interest Account to be applied to pay interest on the Series 2002 Bonds.

(d) Money in the Management Fees Account shall be paid to the Manager as Management Fees for each Fiscal Year if and when the Trustee shall have determined that there are sufficient moneys or Qualified Investments on deposit in such Fiscal Year (i) in the Interest Account of the Bond Fund to pay all interest due on the Series 2002 Bonds on March 1 of such Fiscal Year (unless such interest payment has already been made) and on September 1 of the immediately succeeding Fiscal Year and (ii) in the Principal Account of the Bond Fund to pay all principal due on the Series 2002 Bonds, whether at maturity or by mandatory sinking fund redemption, on September 1 of the immediately succeeding Fiscal Year. Money in the

-23-

Management Fees Account may be used to make up a deficiency in the Interest Account or the Principal Account of the Bond Fund pursuant to Sections 507(a) and 507(b) hereof, respectively. All investment earnings on the Management Fees Account shall be retained therein.

(e)   Money on deposit in the Net Proceeds Account will be used as provided in Article VIII of the Loan Agreement.

(i)   If the Borrower proceeds under Section 8.1 or 8.2 of the Loan Agreement to have the Net Proceeds used to prepay Notes and redeem Bonds, the Trustee is authorized and directed to transfer to the Prepayment Account amounts on deposit in the Net Proceeds Account one Business Day prior to the day it is needed for that purpose. Such redemption shall be done in accordance with Article III of this Indenture.

(ii)   If the Borrower proceeds under Section 8.1 or 8.2 of the Loan Agreement to have the Net Proceeds applied to the reconstruction or replacement of the Property in connection with which the Net Proceeds were received, upon receipt of notice in writing from the Borrower to such effect, the Trustee is authorized and directed to hold the Net Proceeds in the Net Proceeds Account and apply it to the payment of the costs of the reconstruction or replacement as provided in Section 509(b) hereof as if those costs were Project Costs.

(f)   In the event that the Bonds are declared due and payable prior to maturity for any reason, money in any account of the Project Fund, other than funds held under a Notice of Redemption with respect to Bonds to be redeemed which shall be paid in accordance with such notice, will be immediately transferred to the Interest Account to the extent needed to pay unpaid interest on the Bonds, and then to the Principal Account.

(g)   The Trustee agrees to keep adequate records pertaining to all the accounts in the Project Fund and after the Completion Certificate has been received, to file an accounting for the Project Fund with the Borrower and the Issuer.

(h)   Prior to the Escrow Disbursement Date, the Trustee may not disburse any moneys from the Issuing Expenses Account or the Construction Account, including the Contractor Subaccount thereof, except pursuant to Section 522 hereof. On the Escrow Disbursement Date, the Trustee shall withdraw the sum of $4,572,814.93 from the Construction Account to be applied to payment of the Interim Loan. After the Escrow Disbursement Date, any moneys remaining in the Project Fund shall be transferred to the Interest Account to be applied to pay interest on the Series 2002 Bonds.

*Section 510. Completion of the Project.* Upon receipt of the Completion Certificate, if the Borrower shall notify the Trustee in writing that there shall be on deposit in the Construction Account Excess Construction Funds in excess of $5,000, the Trustee is authorized and directed to transfer such funds to the Prepayment Account to redeem Bonds in accordance with Article III of this Indenture. If there shall be on deposit in the Construction Account Excess Construction Funds in an amount less than $5,000, the Trustee is authorized and directed to transfer such

amount to the Interest Account. Unused Capitalized Interest shall remain in the Interest Account to pay interest on the Bonds in accordance with the applicable provisions of this Indenture.

*Section 511.    Non-presentment of Bonds.* If funds sufficient to pay the principal of any Bond when due (whether at maturity, redemption, acceleration or otherwise) are on deposit with the Trustee and the Bond is not presented to the Trustee for payment, then all liability of the Issuer to the Registered Owner for the payment of the Bond is completely discharged. The Trustee agrees to hold the funds on deposit for any Bonds that have not been presented when due, but without liability for interest, solely for the benefit of the Registered Owners of those Bonds. Thereafter and prior to the transfer provided for in the succeeding paragraph, the sole claim that any Registered Owner who does not present its Bonds for payment when due has for the payment of its Bonds is to receive the funds held for its Bonds by the Trustee.

*Section 512.    Payments to the Borrower from the Bond Fund.* Any amounts remaining in the Bond Fund after payment of all Bonds and payment of all other amounts due hereunder will be paid to the Borrower and this Indenture shall cease to be of further effect (except as to the rights, if any, and immunities of the Trustee hereunder, which shall survive).

*Section 513.    Funds Held in Trust.* All money held in any of the Indenture Funds are held in trust in the custody of the Trustee subject to the provisions of this Indenture which permit their disbursements for specified purposes. All money and securities held in Indenture Funds are subject to the first lien of this Indenture and are not subject to any lien, attachment, garnishment or other claims or proceedings by other creditors of the Borrower, the Issuer or any third party.

*Section 514.    Creation of the Debt Service Reserve Fund.* There is created by this Section by the Issuer and established with the Trustee a trust fund designated the "Foundation Housing, LLC Debt Service Reserve Fund." The Debt Service Reserve Fund initially secures only the Series 2002 Bonds. Additional Bonds may, but are not required to, have separate debt service reserve funds created which secure only such Bonds.

*Section 515.    Payments into Debt Service Reserve Fund.* The Trustee will, upon receipt, deposit the Reserve Requirement with respect to the Series 2002 Bonds into the Debt Service Reserve Fund from Series 2002 Bond proceeds, unless a Reserve Account Insurance Policy has been established therefor as provided herein and such policy has been delivered to the Trustee. The Trustee shall also deposit to the Debt Service Reserve Fund from time to time amounts from the Revenue Account to replenish the Debt Service Reserve Fund in accordance with Section 520(a)(vii) of this Indenture and any applicable provisions of the Loan Agreement.

The amount required to be on deposit in the Debt Service Reserve Fund shall be recomputed by the Borrower not less than semi-annually, and the Trustee shall be notified in writing of any surplus, which shall be transferred to the Revenue Account. On any Interest Payment Date on which the balance in the Debt Service Reserve Fund falls below the Reserve Requirement, the Trustee shall notify the Borrower of such deficit and restore such deficiency through the transfer of funds from the Pledged Revenue Fund as provided in Section 520 of this Indenture. In the event any separate subaccounts have been created in the Debt Service Reserve

Fund such payments shall be applied pro-rata to the Debt Service Reserve Fund and the subaccounts therein.

If a Reserve Account Insurance Policy is established as provided herein and delivered to the Trustee, the Trustee shall transfer amounts existing in the Debt Service Reserve Fund to the Bond Fund for payment of the principal and interest on the Bonds in accordance with Article III of this Indenture.

Section 516.  Use of Money in the Debt Service Reserve Fund.  Money in the Debt Service Reserve Fund shall be used only for the purpose of the payment of maturing principal of or interest on the Bonds, or maturing Amortization Installments, if any, when the other moneys in the Bond Fund are insufficient therefor, or for the reimbursement and payment of the costs of any drawings under Reserve Account Insurance Policies in the Debt Service Reserve Fund in the amounts and for the purposes and on the dates as the Borrower shall instruct the Trustee in writing from time to time, and for no other purpose.  If the Debt Service Reserve Fund, or any sub-account thereof contains both cash and a Reserve Account Insurance Policy available for payment of any Bonds, any cash or Qualified Investments in such Debt Service Reserve Fund or sub-account shall be applied for the purposes of the preceding sentence prior to a drawing on the Reserve Account Insurance Policy.  In the event such Debt Service Reserve Fund or sub-account shall contain more than one Reserve Account Insurance Policy, any draws upon the Reserve Account Insurance Policy shall be made pro-rata.

(b)  The Issuer may, at any time, deposit a Reserve Account Insurance Policy with the Trustee.  The amount available under such Reserve Account Insurance Policy, as certified by the Municipal Insurer, shall be treated as a credit toward the amount required to be held on deposit in the Debt Service Reserve Fund pursuant to the terms hereof.  If the terms of any Reserve Account Insurance Policy provide that the moneys available thereunder for payment of principal and interest on the Bonds may only be applied to the particular Series of Bonds for which such Reserve Account Insurance Policy was established, the Trustee shall maintain a separate subaccount within the Debt Service Reserve Fund for such Series of Bonds.  The moneys in such subaccount shall be held and applied solely for such Series of Bonds, and such Series of Bonds shall have no claim upon or lien for payment from the other moneys in the Debt Service Reserve Fund.

(c)  Investment earnings on the amounts in the Debt Service Reserve Fund shall be transferred to the Interest Account prior to the Escrow Disbursement Date, and thereafter to the Revenue Account, on the last day of each Fiscal Year to the extent such amounts equal or exceed the excess, if any, of the balance in the Debt Service Reserve Fund over the Reserve Requirement.

Section 517.  Renewal and Replacement Fund.  (a) There is created by this Section by the Issuer and established with the Trustee a trust fund designated the "Foundation Housing, LLC Renewal and Replacement Fund" (the "Replacement Fund").

(b)  In accordance with the priority of payments set forth in Section 520(b)(vi) of this Indenture, the Trustee shall transfer from the Revenue Account into the Replacement Fund

amounts as they become available until amounts equal to the Replacement Requirement most recently certified to the Trustee in writing for the then current Fiscal Year have been deposited into the Replacement Fund.

(c)     Investment earnings on amounts in the Replacement Fund shall be transferred to the Revenue Account on the last day of each Fiscal Year to the extent amounts equal or exceed the excess of the balance in the Replacement Fund over the Replacement Requirement.

(d)     Moneys in the Replacement Fund may be used (i) for the purpose of constructing or acquiring replacements of real or personal property that have become worn out, unusable or otherwise obsolete, (ii) for the purpose of making capital improvements to the Series 2002 Project, (iii) for the purpose of making renewals, betterments or other expenditures required to maintain the Series 2002 Project or (iv) for the purpose of reimbursing the Borrower for amounts theretofore expended by the Borrower for the foregoing purposes, in each case upon presentation to the Trustee of a requisition, approved by the Authorized Borrower Representative and the Vice President for Business Services or Vice President for Student Services of the College, in substantially the form attached as *"Exhibit D"* to the Loan Agreement; provided, that if on the date specified for payment in such requisition the aggregate of available moneys on deposit in the appropriate account of the Bond Fund for payment of the principal or redemption price or of the interest on any of the Bonds shall be less than the amount required to be on deposit therein pursuant to the provisions of Section 506 hereof, and if the Trustee shall have first exhausted all moneys in the Revenue Account, the Debt Service Reserve Fund and Prepayment Account that are then available for the payment of such principal, interest or redemption price, then the moneys on deposit in the Replacement Fund shall be transferred to the Bond Fund to the extent of such deficiency therein and used to pay said principal or interest or the redemption price of any such Bonds in accordance with Section 507 hereof. Any moneys so transferred and used for payment of debt service on the Bonds shall be fully replaced by the Trustee according to the flow of funds set forth in Section 520 of this Indenture to the extent funds are available in the account specified in Section 520.

*Section 518.     Operation and Maintenance Fund.*  (a) There is created by this Section by the Issuer and established with the Trustee a trust fund designated the "Foundation Housing, LLC Operation and Maintenance Fund" (the "Operation and Maintenance Fund"), and within the Operation and Maintenance Fund, a Contingency Reserve Account. An initial deposit to the Contingency Reserve Account is to be made from the proceeds of the Series 2002B Bonds pursuant to Section 202(d)(iii) hereof.

(b)     In accordance with the priority of payments set forth in Sections 520(a)(iv), 520(a)(x) and 520(b)(ii) of this Indenture, the Trustee shall transfer from the Revenue Account into the Operation and Maintenance Fund (i) amounts equal to the Operating Expenses of the Series 2002 Project for the corresponding month in the current Fiscal Year to the extent set forth in the Annual Budget as instructed in writing by the Borrower, (ii) amounts equal to the actual Operating Expenses in excess of the amount transferred in (i) above as evidenced by a requisition signed by the Borrower and (iii) amounts sufficient to fund and replenish the Contingency Reserve Account.

(c)    Promptly after the Trustee deposits the required amounts into the Operation and Maintenance Fund, unless there shall then be a deficiency in the Bond Fund with respect to principal or interest then due on the Bonds, the Trustee shall transfer such amounts to an operating account established by the Manager to pay Operating Expenses on behalf of the Borrower according to Section 2 of the Management Agreement (amounts not to be transferred from the Contingency Reserve Account until all other amounts in the Operation and Maintenance Fund have been so transferred). The Borrower shall provide the Trustee a letter of instructions that provides the Trustee with the proper account information and wiring instructions for the transfer discussed above. In the event there is a deficiency in the Bond Fund with respect to principal or interest then due on the Bonds, the Trustee shall transfer amounts from the Operation and Maintenance Fund (amounts not to be transferred from the Contingency Reserve Account until all other amounts in the Operation and Maintenance Fund have been so transferred) to the Interest Account and the Principal Account, in that order, to make up any deficiency therein.

*Section 519.    Operating Reserve Fund.* (a) There is created by this Section by the Issuer and established with the Trustee a trust fund designated the "Foundation Housing, LLC Operating Reserve Fund" (the "Operating Reserve Fund").

(b)    When Pledged Revenues are available for such purpose and only in the order of priority in Section 520(b)(vii) of this Indenture, the Trustee shall transfer available amounts from the Revenue Account into the Operating Reserve Fund until there is on deposit in the Operating Reserve Fund the Operating Reserve Requirement.

(c)    Investment earnings on amounts in the Operating Reserve Fund shall be transferred to the Revenue Account on the last day of each Fiscal Year to the extent amounts on deposit in the Operating Reserve Fund exceed the Operating Reserve Requirement.

(d)    Upon receipt of written requisition from an Authorized Borrower Representative, the moneys in the Operating Reserve Fund shall be used (i) for the purpose of paying Operating Expenses of the Series 2002 Project to the extent of any deficiency in amounts available to the Borrower to pay such Operating Expenses, or (ii) for the purpose of making any payment to the Bond Fund necessary to prevent a default on the Bonds.

(e)    Whenever there shall be on deposit in the Operating Reserve Fund an amount equal to or in excess of the amount required to be on deposit therein pursuant to the provisions of the Loan Agreement, the Trustee shall discontinue making further payments therein, but whenever and as often as any of said moneys are used to such extent that there is on deposit therein less than the required amount, then the Trustee shall resume payments therein out of the moneys made available therefor in the Revenue Account.

*Section 520.    Application of Pledged Revenues to the Indenture Funds.* (a) For as long as any of the principal of and interest on any of the Bonds shall be outstanding and unpaid, or until payment of the Bonds has been provided for as permitted in the Indenture, the Borrower agrees to collect and apply the Gross Revenues only as follows. The Gross Revenues derived from the Series 2002 Project shall upon receipt be deposited into the Pledged Revenue Fund in accordance with Section 504(c)(iv) of this Indenture and shall be used only for the purposes and in the

-28-

manner herein provided. Such Pledged Revenue Fund shall be distributed to the other Indenture Funds by the Trustee monthly, on the fifteenth day of the month, if such day is not a Business Day, on the next succeeding Business Day, in the following order of priority:

(i)     All amounts on deposit in the Pledged Revenue Fund shall first be transferred to the Revenue Account, except for the Pledged Revenues attributable to Security Deposits which shall be deposited into the Security Deposit Account.

(ii)     Amounts on deposit in the Revenue Account shall next be applied to make deposits to the Rebate Fund in an amount equal to any amount required to be deposited therein pursuant to the provisions of the Tax Agreement.

(iii)     Amounts on deposit in the Revenue Account shall next be applied to pay any Trustee's Expenses and Issuer's Expenses which may be due.

(iv)     Amounts on deposit in the Revenue Account shall next be used to deposit in the Operation and Maintenance Fund such amounts as are equal to the Operating Expenses (other than Management Fees) for the Series 2002 Project for the corresponding month in the current Fiscal Year to the extent set forth in the Annual Budget and as most recently certified to the Trustee in writing. Such payments shall be decreased after making allowances for the amounts of money, if any, which are on deposit in the fund established by the Manager according to Section 518(c) of this Indenture from surplus funds from prior months or from investment earnings, as certified by the Manager in writing.

(v)     Amounts on deposit in the Revenue Account shall next be used to deposit into the Interest Account of the Bond Fund such amounts as are equal to one-sixth of the interest becoming due on the Series 2002 Bonds on the next Bond Interest Payment Date. No such deposit need be made to the extent that there are, or will be upon the making of all or a portion of such deposit, sufficient moneys on deposit in the Interest Account (including in the Capitalized Interest Subaccount) to make the payment of interest due on the Series 2002 Bonds on the next Bond Interest Payment Date.

(vi)     Commencing on September 15, 2003, amounts on deposit in the Revenue Account shall next be used to deposit into the Bond Amortization Account created and established within the Bond Fund for the Series 2002 Bonds, an amount equal to one-twelfth of the Amortization Installment for the Series 2002 Bonds on the next date an Amortization Installment is due. No such deposit need be made to the extent that there are, or will be upon the making of all or a portion of such deposit, sufficient moneys on deposit in the Bond Amortization Account to pay the next Amortization Installment due on the Series 2002 Bonds.

(vii)     Amounts on deposit in the Revenue Account shall next be applied to the Debt Service Reserve Fund until there shall be on deposit therein an amount equal to the Reserve Requirement, including the repayment of any draws on any Reserve Account Insurance Policy in the manner specified in Section 515 of this Indenture.

(viii)    Upon the issuance of any Additional Bonds under the terms, limitations and conditions as are provided herein and in the Indenture, the payments into the several accounts in the Bond Fund shall be increased in such amounts as shall be necessary to make the payments for the principal of, interest on and reserves for such Additional Bonds and, if Term Bonds are issued, the Amortization Installments, on the same basis as hereinabove provided with respect to the Bonds initially issued under the Indenture.

(ix)    Amounts on deposit in the Revenue Account shall next be used to deposit into the Management Fees Account of the Project Fund (A) the amount of Management Fees due under the Management Agreement for the corresponding month in the current Fiscal Year to the extent set forth in the Annual Budget and as most recently certified to the Trustee in writing, (B) any amount due as Management Fees under the Management Agreement in any prior month in such Fiscal Year which was not deposited into the Management Fees Account in such month pursuant to the foregoing clause (A) and (C) any amounts required to replenish the Management Fees Account for any withdrawals therefrom pursuant to Section 509(d) hereof to make up any deficiency in the Principal Account or the Interest Account.

(x)    Amounts on deposit in the Revenue Account shall next be used (A) to pay any Operating Expenses for the Series 2002 Project in the current Fiscal Year, pursuant to a requisition signed by the Borrower, which may have accrued in excess of budgeted amounts therefor and were not paid pursuant to paragraph (iv) above, (B) to fund an initial balance of $25,000 in the Contingency Reserve Account and (C) to restore any deficiencies in the Contingency Reserve Account as instructed by the Borrower in writing to the Trustee.

(b)    Any remaining amounts on deposit in the Revenue Account after all the transfers to the Indenture Funds have been made according to Section 520(a) above shall be distributed to the other Indenture Funds by the Trustee in the following order of priority:

(i)    [reserved]

(ii)    Amounts on deposit in the Revenue Account shall next be used to deposit in the Operation and Maintenance Fund such amounts as are necessary for the remaining Operating Expenses (other than Management Fees) for the Series 2002 Project in the entire current Fiscal Year as set forth in the Annual Budget as certified by Borrower in writing.

(iii)    Amounts on deposit in the Revenue Account shall next be used to deposit into the Bond Fund such amounts as will be sufficient to pay all remaining interest becoming due on the Bonds in the current Fiscal Year and on the September 1 immediately succeeding such Fiscal Year. No such deposit need be made to the extent that there are, or will be upon the making of all or a portion of such deposit, sufficient moneys on deposit in the Interest Account (including in the Capitalized Interest Subaccount) to pay all interest coming due on the Series 2002 Bonds in such Fiscal Year and on the September 1 immediately succeeding such Fiscal Year.

-30-

(iv)     Commencing with the Fiscal Year ending August 31, 2004, on a parity with the deposits under paragraph (iii) above in respect of maturing principal, moneys on deposit in the Revenue Account shall next be used to deposit into the Bond Amortization Account created and established within the Bond Fund for the Series 2002 Bonds, a sum equal to the remaining amount of the Amortization Installment for the Series 2002 Bonds which shall become due and payable on the September 1 immediately succeeding such Fiscal Year. No such deposit need be made to the extent that there are, or will be upon the making of all or a portion of such deposit, sufficient moneys on deposit in the Bond Amortization Account to pay such Amortization Installment for on the Series 2002 Bonds.

(v)     Upon the issuance of any Additional Bonds under the terms, limitations and conditions as are provided herein and in the Indenture, the remaining payments into the several accounts in the Bond Fund shall be increased in such amounts as shall be necessary to make the payments for the principal of, interest on and reserves for such Additional Bonds and, if Term Bonds are issued, the Amortization Installments, on the same basis as hereinabove provided with respect to the Bonds initially issued under the Indenture.

(vi)     Amounts on deposit in the Revenue Account shall next be deposited to the Replacement Fund until an amount equal to the Replacement Requirement for the current Fiscal Year has been deposited into the Replacement Fund; once an amount equal to the Replacement Requirement for the current Fiscal Year has been deposited into the Replacement Fund, as certified by the Borrower to the Trustee in writing, no further funds shall be transferred into the Replacement Fund until the beginning of the next succeeding Fiscal Year.

(vii)     Amounts on deposit in the Revenue Account shall next be deposited to the Operating Reserve Fund until there shall be on deposit therein an amount equal to the Operating Reserve Fund Requirement.

(viii)     Amounts on deposit in the Revenue Account shall next be used to deposit into the Management Fees Account of the Project Fund the amount of Management Fees due under the Management Agreement for the remainder of the current Fiscal Year to the extent set forth in the Annual Budget and as most recently certified to the Trustee in writing.

(ix)     So long as the Net Revenues of the Series 2002 Project for the preceding Fiscal Year equal at least one hundred twenty percent (120%) of the Debt Service Requirement for such preceding Fiscal Year, as evidenced by the financial statements delivered to the Trustee by the Borrower pursuant to the Loan Agreement, amounts on deposit in the Revenue Account may be used, as and to the extent available, to pay any amounts owed by the Borrower to CDC Holdings, L.P. pursuant to and in accordance with the Guaranty Reimbursement Agreement.

(ii)   A Certificate of Occupancy issued by the appropriate governmental authorities in the City of Joliet, Illinois certifying that the Series 2002 Project has been certified as ready for occupancy for its intended purpose;

(iii)   A Certificate of the Manager, in substantially the form set forth in Exhibit D hereto, (a) confirming that the then-current occupancy of the Series 2002 Project (as verified by the rent roll therefor provided to the Trustee) is at least 90% of capacity, and (b) stating that the existing and likely projected occupancy of the Series 2002 Project, on the basis of signed leases and the leases then projected to be executed at the current year's actual rental rates, is likely to provide Net Revenues of the Project that are at least 120% of the Debt Service Requirements on the Series 2002 Bonds for the then-remaining Fiscal Year of the Borrower;

(iv)   An ALTA/ACSM Land Title "as built" survey certified by the surveyor to the Trustee updating the survey delivered concurrently with the issuance of the Series 2002 Bonds; and

(v)   Endorsements to the title insurance policy delivered concurrently with the issuance of the Series 2002 Bonds confirming that the Mortgage is a first lien on the Series 2002 Project, subject only to Permitted Encumbrances.

(c)   In the event that the conditions to the disbursement of funds from the Escrow Fund specified in subsection (b) above are not satisfied on or before December 15, 2002 (the "Mandatory Escrow Termination Date") the Trustee shall give notice of a special redemption of all outstanding Series 2002 Bonds as provided in the forms of Series 2002 Bonds appended hereto as Exhibits A and B, respectively, and shall apply such funds to such redemption on January 1, 2003.

The Borrower may cause the Mandatory Escrow Termination Date and the corresponding special redemption date to be extended by (i) depositing an amount with the Trustee sufficient to increase the amount then on deposit in the Interest Account of the Bond Fund and available to pay interest on the Series 2002 Bonds to the amounts indicated below and (b) delivering to the Trustee an Opinion of Bond Counsel addressed to the Trustee and the Issuer to the effect that the proposed extension of the Mandatory Escrow Termination Date will not adversely affect the tax exempt status of the Series 2002 Bonds:

-33-

| To Extend the Mandatory Escrow Termination Date from this Date | To This Date "Extended Mandatory Escrow Termination Date" | Amount Required to be on Deposit | Corresponding New Special Redemption Date |
|---|---|---|---|
| December 15, 2002 | January 15, 2003 | $80,920.84 | February 1, 2003 |
| January 15, 2003 | February 15, 2003 | 161,841.67 | March 1, 2003 |
| February 15, 2003 | March 15, 2003 | 242,762.50 | April 1, 2003 |
| March 15, 2003 | April 15, 2003 | 323,683.34 | May 1, 2003 |
| April 15, 2003 | May 15, 2003 | 404,604.17 | June 1, 2003 |
| May 15, 2003 | June 15, 2003 | 485,525.00 | July 1, 2003 |
| June 15, 2003 | July 15, 2003 | 566,445.84 | August 1, 2003 |
| July 15, 2003 | August 15, 2003 | 647,366.67 | September 1, 2003 |
| August 15, 2003 | September 15, 2003 | 728,287.51 | October 1, 2003 |
| September 15, 2003 | October 15, 2003 | 809,208.34 | November 1, 2003 |

In the event that funds are deposited with the Trustee but the conditions to the disbursement of funds from the Escrow Fund are not satisfied by the applicable Extended Mandatory Escrow Termination Date, the Trustee shall give notice of a special redemption of all Series 2002 Bonds and shall apply such funds to such redemption on the applicable new special redemption date specified above.

(d)    Funds held in the Escrow Fund shall be invested in the Agreement. All interest earnings on the funds in the Escrow Fund shall be deposited in the Interest Account.

Section 522.    Interim Loan; Creation of Interim Loan Fund.  Proceeds of the Interim Loan will be applied in connection with the payment of Project Costs in the following manner.

(a)    There is created by this Section by the Issuer and established with the Trustee a trust fund designated "Foundation Housing, LLC, Interim Loan Fund" (the "Interim Loan Fund"). Moneys shall be deposited into and paid out of the Interim Loan Fund as hereinafter set forth in this Section 522.

(b)    Concurrently with the issuance of the Series 2002 Bonds, the Interim Lender shall deposit the aggregate sum of $636,286.50 with the Trustee pursuant to the Interim Loan. Such amount is equal to the amount of Series 2002 Bond proceeds to be applied to pay (i) Costs of Issuance (including Underwriter's discount) , less the amount of $31,601.21 previously applied by the Interim Lender to pay certain of such Costs of Issuance, and (ii) $65,000 of Project Costs to be paid on or shortly following the date of issuance of the Series 2002 Bonds.

(c)    Concurrently with the issuance of the Series 2002 Bonds, the Interim Lender shall deposit the sum of $397,603.74 with the Trustee pursuant to the Interim Loan, which the Trustee is required to deposit into the Escrow Fund pursuant to Section 521(a) hereof. Such amount is equal to the amount of Series 2002 Bond proceeds to be applied to pay Capitalized Interest on the Series 2002 Bonds.

(d) Upon receipt by the Trustee of the required documentation described in Section 509(a) hereof with respect to the payment of Issuing Expenses, the Trustee shall promptly pay the amounts due to the Persons entitled thereto from funds on deposit in the Interim Loan Fund (excluding the $65,000 therein to be applied to pay Project Costs). Promptly after making such payments, the Trustee shall transfer from the Issuing Expenses Account of the Project Fund to the Escrow Fund an amount equal to the aggregate amount of such payments.

(e) *Project Costs.* Upon receipt by the Trustee of the required documentation described in Section 509(b) or (c) hereof with respect to a draw from the Construction Account for the payment or reimbursement of Project Costs (including Contractor Costs), the Trustee shall promptly give written notice to the Interim Lender that the Trustee has approved such draw request for payment from the Construction Account. The Interim Lender has agreed in the Interim Loan Agreement that, upon receiving any such notice from the Trustee and upon the satisfaction of such additional conditions as the Interim Lender shall have specified in the Interim Loan Agreement, it will promptly deposit the aggregate amount of such draw request so approved by the Interim Lender into an account of the Borrower at the Interim Lender. The Project Developer will give prompt written notice to the Trustee (i) that such deposit has been made and (ii) of the amount thereof. Promptly upon receipt by the Trustee of such notice from the Project Developer that such deposit has been made, the Trustee shall transfer from the Interim Loan Fund (up to the amount of $65,000) or the Construction Account (and to the extent any portion of such Project Costs are also Contractor Costs, from the Contractor Subaccount) to the Escrow Fund an amount equal to the aggregate amount of such deposit.

(f) *Investments Earnings.* Investment earnings on amounts from time to time on deposit in the Interim Loan Fund shall be retained therein.

## ARTICLE VI

### INVESTMENTS

*Section 601. Investments Generally.* Subject to this Article, specifically including Section 607, the Trustee agrees to invest and reinvest money on deposit in the Indenture Funds and accounts created under this Indenture in Qualified Investments as directed in writing by the Borrower. Such investments:

(a) will have maturities or be readily marketable or redeemable prior to maturity in the amounts and not later than the dates as may be necessary to provide funds for the purpose for which the money in any account is to be used,

(b) will be held by or under the control of the Trustee,

(c) will at all times be considered a part of the account for whose benefit the investment was made, and

    (d)   will have any loss or gain attributable to them charged to the account for the benefit of which the investment was made.

The Trustee may make any investments through its own bank investment department or through other financial intermediaries. The Trustee may invest money on deposit in the Indenture Funds in mutual funds of the Trustee, including any such mutual fund for which the Trustee, or any affiliate thereof, receives compensation with respect to such investment, so long as such mutual fund otherwise meets the definition of Qualified Investments.

*Section 602. Tax Covenants.* The Issuer covenants and agrees that it will not take any action or fail to take any action, to the extent permitted by applicable law, with respect to the investment of the proceeds of any Tax-Exempt Bonds issued under this Indenture or with respect to the payments derived from the Notes pledged hereunder or from the Loan Agreement which may result in constituting the Tax-Exempt Bonds "arbitrage bonds" within the meaning of such term as used in Section 148 of the Code. The Issuer further covenants and agrees that it will comply with and take all actions required by the Tax Agreement. The Issuer further covenants that it will not take any action, permit any action to be taken or fail to take any action, to the extent permitted by applicable law, with respect to the investment of the proceeds of any Tax-Exempt Bonds, with respect to the payments derived from the Notes pledged hereunder and from the Loan Agreement, or any other amounts regardless of the source or where held, which may cause the interest on Tax-Exempt Bonds, the interest on which is intended to be exempt from federal income taxation, to be includible in the gross income of the owners thereof for purposes of federal income taxation. The Trustee covenants that it will not take any action, permit any action to be taken or fail to take any action with respect to investments of any amounts held by the Trustee relating to the Bonds, to the extent the Bond Trustee has investment discretion under this Indenture, that may result in any Tax-Exempt Bond being treated as an "arbitrage bond" within the meaning of such term as used in Section 148 of the Code.

*Section 603. Change in Law.* To the extent that published rulings of the Internal Revenue Service, or amendments to the Code or the Regulations modify the covenants of the Issuer or the Trustee which are set forth in this Indenture or which are necessary for interest on any issue of the Tax-Exempt Bonds to be excludable from gross income for federal income tax purposes, the Trustee and the Issuer will comply with such modifications.

*Section 604. Investment of Trust Fund Moneys.* Money on deposit in the Indenture Funds must be invested in Qualified Investments. Prior to the Escrow Disbursement Date, all moneys in all Indenture Funds other than the Interim Loan Fund shall be invested pursuant to the Investment Agreement.

## ARTICLE VII

## DISCHARGE OF INDENTURE

*Section 701 Discharge.* This Indenture, the Notes, the Mortgage and the Loan Agreement and the estate and rights granted by them cease, determine and are void with respect

to any particular series of Bonds, other than the rights and immunities of the Trustee hereunder, if:

      (a)    the Issuer and the Borrower have performed all of their obligations under the Borrower's Documents, the Indenture, and the Bonds with respect to such series of Bonds;

      (b)    all Trustee's Expenses and the expenses of any other paying agent which have accrued and will accrue through the final payment of such series of Bonds have been paid or arrangements satisfactory to the Trustee for their payment have been made;

      (c)    all Issuer's Expenses, if any, which have accrued and will accrue through the final payment of such series of Bonds have been paid or arrangements satisfactory to the Issuer for their payment have been made;

      (d)    provision for the payment of such series of Bonds has been made to the satisfaction of the Trustee in one or more of the following ways:

          (1)    by paying or causing to be paid, when due, the principal of, premium, if any, and interest on all Bonds of such series;

          (2)    by depositing with the Trustee, in trust, at or before maturity, money in an amount sufficient to pay or redeem (when redeemable) all Bonds of such series including unpaid interest which has accrued on the Bonds of such series and will accrue through the final payment or redemption of the Bonds and any redemption premium;

          (3)    by delivering to the Trustee, for cancellation, all Bonds of such series; or

          (4)    by depositing with the Trustee, in trust, Defeasance Obligations which mature in an amount which will, together with the income or increment to accrue on them, but without reinvestment, be sufficient to pay or redeem (when redeemable) all Bonds of such series at or before their respective maturity dates, including interest which has accrued on the Bonds and will accrue through the final payment or redemption of the Bonds and any redemption premium,

      (e)    a Redemption Notice has been given as required by Article III of this Indenture if any of the Bonds of such series are to be redeemed before their maturity or if a Redemption Notice cannot then be given as provided in Article III of this Indenture, then the Borrower has given the Trustee, in a form satisfactory to the Trustee, irrevocable instructions to provide a Redemption Notice to the Registered Owners of any Bonds of such series to be redeemed in accordance with Article III when a Redemption Notice can be timely given under the Indenture;

Upon the occurrence of the events described in (a) through (e) above, the Trustee is authorized and directed to:

(f)     cancel the applicable Notes and deliver them to the Borrower;

(g)     if all Bonds have been discharged, execute and deliver all appropriate instruments evidencing and acknowledging the satisfaction of the Indenture, the Mortgage and the Loan Agreement; and

(h)     if all Bonds have been discharged, assign and deliver to the Borrower any money and investments in any Indenture Fund (except money or investments held by the Trustee for the payment of the principal of, premium, if any, and interest on any Bonds).

Notwithstanding any other provision of this Indenture which may be contrary to the provisions of this Article, all money and Defeasance Obligations which are set aside and held in trust pursuant to the provisions of this Article for the payment of the principal of, premium, if any, and interest on any Bonds will be applied to and used solely for the payment of the principal of, premium, if any, and interest on the particular Bonds with respect to which it was so set aside in trust.

## ARTICLE VIII

### DEFAULTS AND REMEDIES

*Section 801.     Events of Default.* The occurrence and continuance of any of the following events is an Event of Default under this Indenture:

(a)     Failure to pay when due the principal of (whether at maturity, redemption, acceleration or otherwise), premium, if any, or interest on any Bonds.

(b)     An Event of Default under the Loan Agreement or the Mortgage has occurred and is continuing.

(c)     An order or decree is entered, with the consent or acquiescence of the Issuer, appointing a receiver or receivers for the Series 2002 Project or approving a petition filed against the Issuer seeking reorganization of the Issuer under any state or federal bankruptcy or similar law or statute or, if the order or decree has been entered without the consent or acquiescence of the Issuer, failure to have it vacated, discharged or stayed on appeal within thirty (30) days after its entry.

(d)     The institution of any proceeding with the consent or acquiescence of the Issuer for the purpose of effecting a composition between the Issuer and its creditors or for the purpose of adjusting the claims of the Issuer's creditors pursuant to any Federal or state statute now or hereafter enacted if the claims of the Issuer's creditors are under any circumstances payable from the Pledged Revenues.

(e)     Under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assumes custody or control of the Issuer or of all or any substantial part of its property and the custody or control is not terminated within thirty (30) days from the date of assumption of the custody or control.

(f)     The Issuer defaults in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the Bonds, this Indenture or any supplemental indenture on the part of the Issuer to be performed and the default continues for thirty (30) days after written notice specifying the default and requiring that it be remedied has been given to the Issuer and the Borrower by the Trustee.

(g)     The occurrence of a Determination of Taxability.

Section 802.     Remedies.  The Trustee is granted the following rights and remedies:

(a)     Upon the occurrence and continuance of an Event of Default specified in Section 801(a) of this Indenture and resulting from an event described in Section 9.1(e) or (f) of the Loan Agreement, the entire principal amount of Bonds then Outstanding and the interest accrued thereon automatically becomes due and payable immediately, without the necessity of any action on the part of the Issuer or the Trustee. The Trustee agrees to give written notification of an automatic acceleration to the Issuer, the Borrower and the College.

(b)     Upon the occurrence and continuance of an Event of Default other than an Event of Default specified in Section 801(a), the Trustee may and, upon receipt of direction from the Registered Owners of a majority in principal amount of the Bonds Outstanding to do so, shall, by written notice to the Issuer, the Borrower and the College declare the principal of and accrued interest on the Bonds (if not then due and payable) to be due and payable immediately.

(c)     Upon the occurrence and continuance of any Event of Default, the Trustee may take whatever action at law or in equity it deems necessary or desirable to (i) collect any amounts then due under this Indenture, the Bonds, the Notes, the Mortgage and the Loan Agreement; (ii) enforce performance of any obligation, agreement or covenant of the Issuer under this Indenture or the Bonds, of the Borrower under any of the Borrower's Documents, of a guarantor under any guaranty given with respect to the Bonds or of the grantor of any other collateral given to secure the payment of the Bonds; or (iii) otherwise enforce any of its rights.

(d)     None of the remedies under this Indenture is exclusive of any other remedy or remedies.  Each remedy given under this Indenture is cumulative and is in addition to every other remedy which is given, or which now or hereafter exists, at law, in equity or by statute.  The remedies under this Indenture include the remedies granted under the Loan Agreement including but not limited to, the appointment of a receiver for the Series 2002 Project, as described in Section 9.2 of the Loan Agreement.

(e)     No delay or omission in the exercise of any right or power accruing upon an Event of Default impairs the right or power of the Issuer in connection therewith or is a waiver of or acquiescence in any Event of Default. Every right and power given by this Indenture may be exercised from time to time and as often as may be deemed expedient.

(f)     No waiver of any Event of Default extends to or affects any subsequent or other Event of Default or impairs any rights or remedies consequent thereon.

(g)     Upon any acceleration of amounts due on the Bonds pursuant to this Indenture the Issuer and the Trustee will declare the Notes, and all amounts payable under them, to be due and payable if the amounts due on the Notes have not automatically been accelerated.

*Section 803.     Reserved.*

*Section 804.     Application of Proceeds.*  (a) If the principal of all the Bonds is not due, whether by declaration by the Trustee pursuant to Section 802 or otherwise, then any money received by the Issuer or the Trustee as a result of the exercise of one or more of the remedies granted by this Indenture or any of the Borrower's Documents will be applied as follows:

FIRST: To fund any deficiency in the Rebate Fund.

SECOND: To the payment of  (i) first, any Trustee's Expenses, and thereafter (ii) the costs and expenses associated with the exercise of any remedy granted by this Indenture or any of the Borrower's Documents, including reasonable compensation to the Trustee, the Issuer, and any of their attorneys and agents, and (iii) any Issuer's Expenses.

THIRD:  To the payment of interest then due on the Bonds, in the order of the maturity of the payments of interest then due, and, if the amount available is not sufficient to pay in full any particular installment of interest, then to the payment of interest ratably, according to the amounts due, to the Persons entitled to it without discrimination or privilege.

FOURTH: To the payment of principal and premium, if any, then due on the Bonds (other than Bonds called for redemption for the payment of which money is held pursuant to the provisions of this Indenture), in the order of the maturity of the payments of principal and premium then due, and, if the amount available is not sufficient to pay in full all Bonds due on any particular date, then to their payment ratably, according to the amount of principal due, to the Persons entitled to it without any discrimination or privilege.

(b)     If the principal of the Bonds is due, whether by declaration by the Trustee pursuant to Section 802 or otherwise, then any money received by the Issuer or the Trustee as a result of the exercise of one or more of the remedies granted by this Indenture or any of the Borrower's Documents will be applied as follows:

FIRST:    To fund any deficiency in the Rebate Fund.

SECOND: To the payment of (i) first, any Trustee's Expenses, and thereafter (ii) the costs and expenses associated with the exercise of any remedy granted by this Indenture or any of the Borrower's Documents, including reasonable compensation to the Trustee, the Issuer, and any of their attorneys and agents, and (iii) any Issuer's Expenses.

THIRD:    To the payment of the full amount of the principal of, premium, if any, and interest then due and unpaid on the Bonds. In the event money available for that purpose is insufficient to pay the full amount due, then the money which is available for that purpose will be applied ratably according to the aggregate of principal, interest and premium, if any, then due without preference or priority as between principal, interest or premium.

FOURTH: To the payment of any other sums required to be paid by the Borrower pursuant to any provisions of this Indenture or the Borrower's Documents.

FIFTH:    Any balance is to be paid to the Borrower, to whoever may be lawfully entitled to receive it, or as any court of competent jurisdiction may direct.

(c)    If the principal of all the Bonds has been declared due and payable and if the declaration is thereafter rescinded and annulled under the provisions of this Article then, subject to the provisions of subsection (b) of this Section in the event that the principal of all the Bonds later becomes due or is declared due and payable, the money is to be applied in accordance with the provisions of subsection (a) of this Section and any amounts transferred to the Principal Account and Interest Account of the Bond Fund from an account of the Project Fund will be returned to the account from which they were taken.

(d)    Whenever money is to be applied pursuant to the provisions of this Section, the money is to be applied at the times the Trustee determines, having due regard to the amount of money available for application and the likelihood of additional money becoming available for application in the future.

(e)    Whenever the Trustee applies funds under this Section it will fix the date (which will be a Bond Interest Payment Date unless it deems another date more suitable) upon which the application is to be made and on that date interest on the amounts of principal paid ceases to accrue. The Trustee agrees to give any notice it deems appropriate of the deposit with it of any money under this Section and of the fixing of the payment date. Payments of principal to the Registered Owner of any unpaid Bonds will not be made until the Bond is presented to the Trustee at its Principal Corporate Trust Office for appropriate endorsement or for cancellation if fully paid.

Section 805.    *Remedies Vested in Trustee.* All rights of action (including the right to file proofs of claim) under this Indenture or under the Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production of them in any trial or other proceeding relating to them. Any suit or proceeding instituted by the Trustee is to be brought in its name as

-41-

Trustee without the necessity of joining as plaintiffs or defendants the Registered Owners. Any resulting recovery or judgment is for the benefit of the Registered Owners of the Outstanding Bonds and shall be applied in accordance with the terms of this Indenture.

Section 806.    Rights and Remedies of the Holders of Bonds. No holder of any Bonds has any right to institute any suit, action or proceeding in equity or at law for the enforcement of this Indenture, for the execution of any trust created under this Indenture, for the appointment of a receiver or any other remedy, unless:

(a)    an Event of Default has occurred of which the Trustee has been notified as provided in Section 901(j) or of which by that Section it is deemed to have notice;

(b)    the Trustee has received a written direction from the Registered Owners of at least 10% of the aggregate principal amount of Bonds then Outstanding and has been offered a reasonable opportunity either to proceed to exercise the powers granted in this Article or to institute an action, suit or proceeding in its own name;

(c)    the Trustee has been offered indemnity as provided in Section 901(o); and

(d)    the Trustee thereafter fails or refuses to exercise the powers granted in this Article or to institute an action, suit or proceeding in its own name.

No holder of Bonds has any right to affect, disturb or prejudice the security of this Indenture by its action or to enforce any right under this Indenture except in the manner provided in this Indenture, and all proceedings at law or in equity are to be conducted in the manner provided in this Indenture for the equal and ratable benefit of all the holders of Bonds. Nothing in this Indenture, however, affects or impairs the right of the holders of Bonds to enforce the payment of the principal of, premium, if any, and interest on any Bonds at and after their maturity or the obligation of the Issuer to pay the principal of, premium, if any, and interest on the Bonds issued under this Indenture to the holders of Bonds at the time, place, from the source and in the manner expressed in this Indenture and the Bonds.

Section 807.    Termination of Proceedings. If the Trustee has proceeded to enforce any right under this Indenture and the proceedings have been discontinued, abandoned for any reason or determined adversely, then any amounts transferred to the Principal and Interest Account from an account of the Project Fund will be returned to the account from which they were taken, the Issuer and the Trustee are restored to their former positions and rights under this Indenture and all rights, remedies and powers of the Trustee continue as if no proceedings had been taken.

Section 808.    Waivers of Events of Default. The Registered Owners of 60% or more in aggregate principal amount of Outstanding Bonds may waive any Event of Default under this Indenture and its consequences and rescind any declaration of maturity of principal of and interest on Bonds. Notwithstanding the preceding sentence, no Event of Default in the payment of the principal of, premium, if any, or interest on any Bonds may be waived unless prior to the waiver all arrears of principal, premium, if any, and interest on the Bonds, and all expenses of the Issuer and the Trustee in connection with the Default have been paid or provided for.

-42-

## ARTICLE IX

### THE TRUSTEE

*Section 901.* *Acceptance of the Trusts.* The Trustee accepts and agrees to perform the duties of the Trustee under this Indenture, together with those duties of the Issuer which have been assigned to the Trustee pursuant to Granting Clause First of this Indenture upon the following terms and conditions:

(a) The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, agrees to perform the duties, but only the duties, specifically set forth in this Indenture. In case an Event of Default has occurred and has not been cured or waived, the Trustee agrees to exercise the rights and powers vested in it by this Indenture as provided in this Indenture and to use the same degree of care and skill in their exercise as a prudent man would exercise under similar circumstances in the conduct of his own affairs.

(b) The Trustee may execute any of the trusts or powers and perform any of its duties by or through attorneys, agents, receivers or employees including employees of other departments of the bank in which the Trustee is a department or a bank affiliated with the Trustee. The Trustee is answerable for the conduct of those persons in accordance with the standard specified in (a) above.

(c) The Trustee is entitled to advice of Counsel concerning all matters of trusts and duties arising under this Indenture and may pay reasonable compensation to all Counsel, agents, receivers and employees as it may reasonably employ in connection with this Indenture. The Trustee may act upon the written Opinion of any Counsel (who may be Counsel for the Issuer or the Borrower) approved by the Trustee in the exercise of reasonable care. The Trustee is not responsible for any loss or damage resulting from any action taken or not taken in good faith in reliance upon the written Opinion of Counsel.

(d) The Trustee is not responsible for (i) any recital in this Indenture or in the Bonds other than the certificate of the Trustee on the Bonds, (ii) the validity of the execution by the Issuer of this Indenture or of any supplements to it or instruments of further assurance or (iii) for the sufficiency of the security for the Bonds issued under this Indenture or intended to be secured by this Indenture.

(e) Except as otherwise specifically provided in this Indenture, the Trustee has no obligation to perform any of the duties of the Borrower under the Borrower's Documents or to ascertain or inquire as to the observance of any covenants, conditions or agreements by the Borrower. The Trustee may require the Issuer or the Borrower to provide information as to the performance of its covenants, conditions and agreements under this Indenture, the Bonds or any of the Borrower's Documents and as to the condition of the Trust Estate.

# EXHIBIT B

**Instrument of Removal of Trustee,**
**Appointment of Successor Trustee, and**
**Acceptance by Successor Trustee**

February 23, 2005

*via Federal Express*

First Midwest Bank
2801 West Jefferson Street
Joliet, Illinois 60435
Attn: Corporate Trust Department

Foundation Housing, LLC
c/o Joliet Junior College Foundation
1215 Houbolt Road
Joliet, Illinois 60431
Attn: President

The County of Will, Illinois
302 North Chicago Street
Joliet, Illinois 60432
Attn: Office of Will County Executive

> RE:   **$13,985,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A; and $470,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (collectively, the "<u>Bonds</u>")**

Ladies and Gentlemen:

    Reference is made to that certain Trust Indenture, dated as of May 1, 2002 (as the same may have been amended, the "<u>Indenture</u>"), by and between The County of Will, Illinois (the "<u>Issuer</u>") and First Midwest Bank, an Illinois banking corporation, as Trustee (the "<u>Prior Trustee</u>"), pursuant to which the above-referenced Bonds were issued, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086521. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Indenture. Reference is also made to that certain Loan Agreement, dated as of May 1, 2002 (the "<u>Loan Agreement</u>"), between the Issuer and Foundation Housing, LLC (the "<u>Borrower</u>"), pursuant to which the Issuer loaned the proceeds of the Bonds to the Borrower, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086522; and to that Mortgage, Security Agreement and Assignment of Rents and Leases, dated as of May 1, 2002 (the "<u>Mortgage</u>"), by the Borrower in favor of the Issuer and assigned to the Trustee as security for the payment of the Bonds, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086520.

    The undersigned (the "<u>Bondholders</u>") are the owners of approximately 69% in aggregate principal amount of the Outstanding Bonds as of this date.

Instrument of Removal of Trustee, Appointment of
Successor Trustee, and Acceptance by Successor Trustee
February 23, 2005
Page 2

## REMOVAL OF TRUSTEE

Pursuant to Section 907 of the Indenture, the Bondholders hereby remove the Prior Trustee as Trustee, effective immediately upon receipt by the Prior Trustee of this Instrument. Pursuant to Section 910 of the Indenture, the Prior Trustee is also removed as trustee of funds, as Registrar, and as paying agent for the Bonds. All provisions of this Instrument pertaining to the Prior Trustee shall also pertain to the Prior Trustee as trustee of funds, as Registrar, and as paying agent for the Bonds.

Nothing herein shall relieve the Prior Trustee of any duty in the Indenture or under applicable law requiring the Prior Trustee to assist in the orderly transfer of the Trust Estate under the Indenture and to confirm the Trust Estate in the Successor Trustee (defined below), including, without limitation, the duties of the Prior Trustee under Section 909 of the Indenture, and the duties set forth more fully below.

## APPOINTMENT OF SUCCESSOR TRUSTEE

Pursuant to Section 908 of the Indenture, the Bondholders hereby appoint Manufacturers and Traders Trust Company as successor Trustee (the "Successor Trustee"), effective immediately upon receipt of this Instrument by the Prior Trustee, the Issuer and the Borrower.

## ACCEPTANCE OF SUCCESSOR TRUSTEE

By its signature below, the Successor Trustee hereby accepts its appointment as successor Trustee, pursuant to Section 909 of the Indenture. The Successor Trustee hereby agrees to act as trustee of funds, as Registrar, and as paying agent for the Bonds as required under Section 910 of the Indenture. Also by its signature below, the Successor Trustee represents that it is a trust company or a bank in good standing having a reported capital and surplus of not less than $75,000,000 or having assets under administration of not less than $100,000,000. This Instrument shall constitute notice of acceptance by the Successor Trustee pursuant to Section 909 of the Indenture.

## INSTRUMENT TO BE FILED FOR RECORD

Pursuant to Section 909 of the Indenture, the Successor Trustee shall have this Instrument filed and/or recorded in each recording office where any of the Borrower's Documents (as defined in the Indenture and Loan Agreement) has been filed and/or recorded.

## EFFECT OF REMOVAL AND APPOINTMENT; DIRECTION TO PRIOR TRUSTEE

Immediately upon receipt of this letter by the Prior Trustee, the Successor Trustee shall become fully vested with all the property, rights, powers and duties of the Prior Trustee under the Indenture. Such date of receipt shall be referred to herein as the "Effective Date." Copies of this Instrument shall be sent simultaneously to the Prior Trustee, the Successor Trustee, the Borrower, the Issuer and the Bondholders by overnight delivery such that removal of the Prior Trustee and appointment of the Successor Trustee shall be simultaneous.

Obligations of the Trustee arising prior to the Effective Date shall be the responsibility of the Prior Trustee. Obligations of the Trustee arising on or after the Effective Date shall be the responsibility of the Successor Trustee.

Instrument of Removal of Trustee, Appointment of
Successor Trustee, and Acceptance by Successor Trustee
February 23, 2005
Page 3

Notwithstanding any of the foregoing, the Successor Trustee shall have no responsibility for trust assets or security instruments until such time as such trust assets and security instruments are transferred to it by the Prior Trustee.

As required by Section 909 of the Indenture, the Prior Trustee hereby is directed to execute, acknowledge and deliver such instruments of conveyance and do such other things as may reasonably be required by the Successor Trustee or its counsel for more fully and certainly vesting and confirming in the Successor Trustee all the trusts, powers and duties under the Indenture and the Mortgage and any other property held by the Prior Trustee under the Indenture, and shall pay over, assign and deliver to the Successor Trustee any money or other property subject to the trusts and conditions set forth in the Indenture. Without limiting the generality of the foregoing, the Bondholders hereby direct the Prior Trustee to:

1) Provide to the Successor Trustee any originals of and complete copies of the Indenture, Loan Agreement, and Mortgage, the Interim Loan Agreement and related documents, the Interim Security Documents, the Management Agreement, the Tax Agreement, the Subordinate Note and Mortgage and all other documents pertaining to the Bonds (all as defined in the Loan Agreement and Indenture), and all other agreements and documents executed in connection therewith, and all amendments and modifications to the foregoing;

2) Provide to the Successor Trustee the originals of any notes, letters of credit, insurance policies, or other pledged security under the Indenture including, without limitation, any credit facility, endorsed and assigned to the Successor Trustee as directed by the Successor Trustee;

3) Provide to the Successor Trustee copies of all UCC-1 financing statements, UCC-3 continuation statements, evidence of the recorded Indenture, Loan Agreement and Mortgage, and all other documents filed of record in connection with the Bonds;

4) Provide to the Successor Trustee a copy of the Prior Trustee's entire correspondence file relating to the Bonds including, without limitation, copies of all default notices and other formal notices or documents sent or received by the Prior Trustee;

5) Provide to the Successor Trustee detailed trust account statements for all accounts required under the Indenture or otherwise maintained by the Prior Trustee in connection with the Bonds, from the date of issuance of the Bonds to the Effective Date;

6) Assist in the timely transfer of any pledged security requiring formal transfer to the Successor Trustee, including, without limitation, any letters of credit or guaranteed investment contracts;

7) Provide to the Successor Trustee a final accounting of all amounts due the Prior Trustee through the Effective Date;

8) Provide to the Successor Trustee the Completion Certificate, and all financial reports and compliance reports from the project of the Bonds.

FEB. 23. 2005  1:04PM    GREENBERG TRAURIG                    NO. 337  P. 9

Instrument of Removal of Trustee, Appointment of
Successor Trustee, and Acceptance by Successor Trustee
February 23, 2005
Page 4

The Prior Trustee hereby is directed immediately to contact Mr. Jacob Smith, Vice President,
Manufacturers and Traders Trust Company, and forthwith to effect the transfer of all trust assets to the
Successor Trustee. Time is of the essence. Mr. Smith may be contacted as follows:

Mr. Jacob Smith, Vice President
Manufacturers and Traders Trust Company
Corporate Trust Services
25 South Charles Street, 16th Floor
Baltimore, MD 21201
Tel.    410-244-4223
Fax    410-244-3725
E-mail  jhsmith@mandtbank.com

If you have any questions, please contact counsel to the Successor Trustee, Warren S. Bloom, Esq.,
Greenberg Traurig, P.A., at (407) 420-1000.

COLUMBIA MANAGEMENT ADVISORS, AS
BONDHOLDER, holding Bonds in the total principal
amount of $8,800,000.00 in the following funds: Nations
MD Intermediate Municipal Bond Fund ($1,900,000.00);
Nations VA Intermediate Municipal Bond Fund
($1,900,000.00); and Nations Municipal Income Fund
($5,000,000.00).

By
Name    Deena C. Ethridge
Title     Vice President

Columbia Management Advisors
1 Financial Center
Mail Stop MA5-515-13-02
Boston, MA 02111
Attn:    Deena C. Ethridge
Tel.:    617-772-3712
Fax:    617-737-0358
Deena.Ethridge@columbiamanagement.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Instrument of Removal of Trustee, Appointment of
Successor Trustee, and Acceptance by Successor Trustee
February 23, 2005
Page 5

SIT INVESTMENT ASSOCIATES, INC., AS
BONDHOLDER, holding Bonds in the total principal
amount of $1,170,000.00 in the following funds: Sit Tax-
Free Income Fund ($500,000); and four private accounts
(collectively $670,000.00).

By _____

Name    Debra A. Sit

Title    Vice President

Sit Investment Associates, Inc.
3300 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Attn:    Paul Jungquist
Tel.:    612-359-2546
Fax:    612-313-0326
pji@sitinvest.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Instrument of Removal of Trustee, Appointment of
Successor Trustee, and Acceptance by Successor Trustee
February 23, 2005
Page 6


Acceptance of Successor Trustee:

MANUFACTURERS AND TRADERS TRUST
COMPANY, AS SUCCESSOR TRUSTEE

By
Name    Jay Smith
Title    Vice President


Originals via Federal Express:
   Ms. Deena C. Ethridge, Columbia Management Advisors
   Mr. Paul Jungquist, Sit Investment Associates, Inc.
   Mr. Jacob Smith, Manufacturers and Traders Trust Company
Copy:   Warren S. Bloom, Esq.

# EXHIBIT C

February 23, 2005

*via Federal Express*

First Midwest Bank
2801 West Jefferson Street
Joliet, Illinois 60435
Attn: Corporate Trust Department

Manufacturers and Traders Trust Company
Corporate Trust Services
25 South Charles Street, 16th Floor
Baltimore, MD 21201
Attn: Mr. Jacob Smith, Vice President

> RE: **$13,985,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A; and $470,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (collectively, the "Bonds")**

Ladies and Gentlemen:

Reference is made to that certain Trust Indenture, dated as of May 1, 2002 (as the same may have been amended, the "Indenture"), by and between The County of Will, Illinois (the "Issuer") and First Midwest Bank, as Trustee (the "Prior Trustee"), pursuant to which the above-referenced Bonds were issued, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086521. Reference is also made to that certain Loan Agreement, dated as of May 1, 2002 (the "Loan Agreement"), between the Issuer and Foundation Housing, LLC (the "Borrower"), pursuant to which the Issuer loaned the proceeds of the Bonds to the Borrower, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086522. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Indenture or the Loan Agreement, as applicable.

The undersigned (the "Bondholders") are the owners of approximately 69% in aggregate principal amount of the Outstanding Bonds as of this date.

Simultaneously with the execution of this letter, the Bondholders are executing that certain *Instrument of Removal of Trustee, Appointment of Successor Trustee, and Acceptance by Successor Trustee* (the "Instrument"), pursuant to which, among other things, the Prior Trustee is being removed as Trustee under the Indenture and Manufacturers and Traders Trust Company is being appointed as successor Trustee (the "Successor Trustee") under the Indenture.

**THE PRIOR TRUSTEE AND THE SUCCESSOR TRUSTEE ARE HEREBY DIRECTED BY THE UNDERSIGNED BONDHOLDERS AS FOLLOWS: (1) TO NOT MAKE THE MARCH 1, 2005 INTEREST PAYMENT ON THE BONDS, AND TO NOT MAKE ANY RELATED TRANSFERS OF MONIES AMONG TRUST ESTATE ACCOUNTS OR FUNDS PURSUANT TO SECTION 507 OF THE INDENTURE; (2) TO HOLD AS PART OF THE TRUST ESTATE ANY AND ALL MONIES RECEIVED AND/OR HELD ON ACCOUNT OF THE BONDS, INCLUDING WITHOUT LIMITATION THOSE WHICH WOULD HAVE OTHERWISE BEEN PAID TO HOLDERS OF THE BONDS AS PART OF THE MARCH 1, 2005 INTEREST**

First Midwest Bank
Manufacturers and Traders Trust Company
February 23, 2005
Page 2

_____

PAYMENT ON THE BONDS (such direction, collectively, the "<u>Direction</u>"). **THE DIRECTION SHALL APPLY TO THE PRIOR TRUSTEE AND TO THE SUCCESSOR TRUSTEE TO THE EXTENT THAT EACH SHALL HAVE POSSESSION OR CONTROL OF THE TRUST ESTATE, OR PORTIONS THEREOF, ON MARCH 1, 2005 OR, FOR PURPOSES OF REFRAINING TO MAKE TRANSFERS UNDER SECTION 507 OF THE INDENTURE, THREE DAYS PRIOR TO MARCH 1, 2005, WHETHER AS TRUSTEE UNDER THE INDENTURE OR AS THE REMOVED TRUSTEE UNDER THE INDENTURE OR FOR ANY REASON WHATSOEVER.**

This direction is in accordance with the Indenture.

Events of Default currently exist under Section 801(b) of the Indenture, among others. Section 801(b) provides that an Event of Default under the Loan Agreement or the Mortgage constitutes an Event of Default under the Indenture. Section 9.1(a) of the Loan Agreement provides that failure by the Borrower to pay when due the principal of, premium, if any, or interest on the Notes is an Event of Default under the Loan Agreement. The Loan Agreement and the Notes provide that the Borrower shall repay the loan of the proceeds of the Bonds such that the Trustee shall receive monies in the amounts necessary to make the payments on the Bonds. The failure of the Borrower to make sufficient payments to the Trustee that the Trustee may make the March 31, 2005 interest payment on the Bonds, pursuant to Section 203 of the Indenture, is thus an Event of Default under Section 801(b) of the Indenture.

Under Section 901(o) of the Indenture, the Trustee may require indemnity to protect it against liability which it may incur except liability which is adjudicated to have resulted from its gross negligence or willful default. Accordingly, the undersigned Bondholders hereby agree to indemnify the Prior Trustee and Successor Trustee and save each such entity harmless from fees, charges, expenses, costs, claims, losses, liabilities or damages incurred by either entity as a direct result of its acting in accordance with the Direction provided herein, except for fees, charges, expenses, costs, claims, losses, liabilities or damages incurred by it as a result of its own gross negligence or willful default. For the purposes of this paragraph, any determination of whether or not the Prior Trustee or Successor Trustee has engaged in willful default or has been grossly negligent (or any like determination) shall be made by a court of competent jurisdiction. At the Bondholders' discretion, the Bondholders may direct any proceedings necessary to such indemnification, including without limitation choice and retention of counsel to represent the Prior Trustee or Successor Trustee. If either of the Prior Trustee or the Successor Trustee is not in possession of the portions of the Trust Estate to which the Direction applies on March 1, 2005, or, for purposes of refraining to make transfers under Section 507 of the Indenture, three days prior to March 1, 2005, such that the Direction cannot apply to that entity, then the indemnification provided in this paragraph shall be moot and of no effect with regard to that entity.

If you have any questions, please contact counsel to Manufacturers and Traders Trust Company, Warren S. Bloom, Esq., Greenberg Traurig, P.A., at (407) 420-1000.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

First Midwest Bank
Manufacturers and Traders Trust Company
February 23, 2005
Page 4

SIT INVESTMENT ASSOCIATES, INC., AS
BONDHOLDER, holding Bonds in the total principal
amount of $1,170,000.00 in the following funds: Sit
Tax-Free Income Fund ($500,000); and four private
accounts (collectively $670,000.00).

By _____
Name   Debra A. Sit
Title   Vice President

Sit Investment Associates, Inc.
3300 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Attn:   Paul Jungquist
Tel.:   612-359-2546
Fax:    612-313-0326
pjj@sitinvest.com

Copy:   The County of Will, Illinois
        Foundation Housing, LLC
        Warren S. Bloom, Esq.

# EXHIBIT D

Appendix B

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS

FIRST MIDWEST BANK, an Illinois )
Banking Corporation, )
)
)
Plaintiff, )                          **05 CH 0503**
)
vs. )                          Case No:
)
THE COUNTY OF WILL, a Body )
Politic and Corporate, FOUNDATION )
HOUSING, LLC, an Illinois Limited Liability )
Company, COLUMBIA MANAGEMENT )
ADVISORS, a Bondholder holding )
Bonds in the total principal amount )
of $8,800,000, SIT INVESTMENT )
ASSOCIATES, INC., a Bondholder )
holding Bonds in the total principal )
amount of $1,170,000, )
)
Defendants. )



## <u>COMPLAINT FOR INTERPLEADER</u>

NOW COMES the Plaintiff, FIRST MIDWEST BANK, an Illinois Banking Corporation, by its attorneys, KROCKEY, CERNUGEL, COWGILL, CLARK & PYLES, LTD., by Robert S. Krockey, and complaining of the Defendants, the COUNTY OF WILL, a Body Politic and Corporate, FOUNDATION HOUSING, LLC, an Illinois Limited Liability Company, COLUMBIA MANAGEMENT ADVISORS, a Bondholder holding Bonds in the principal amount of $8,800,000, and SIT INVESTMENT ASSOCIATES, INC., a Bondholder holding Bonds in the total principal amount of $1,170,000, alleges as follows:

1. This is a COMPLAINT FOR INTERPLEADER brought pursuant to Section 2-409 of the Code of Civil Procedure (735 ILCS 2/409).

2. Plaintiff, FIRST MIDWEST BANK, is the Trustee of a certain trust Indenture between the Defendant, COUNTY OF WILL, ILLINOIS, dated as of May 1, 2002, relating to $13,985,000 County of Will, Illinois, Student Housing Revenue Bonds, Series 2002A and $470,000 of COUNTY OF WILL Student Housing Revenue Bonds, Taxable Series 2002B, all as set forth in the Trust Indenture recorded on May 23, 2002 in the Office of the Will County Recorder of Deeds as Document

Initial case management set for
6-27-05 at: 8:30 am

R2002086521, a true and exact copy of which is attached hereto, marked Exhibit A and by reference thereto is specifically made a part hereof.

3.    That the COUNTY OF WILL, ILLINOIS is a body politic and corporate and a unit of local government created and existing under the laws of the State of Illinois and is the issuer of the bonds described in the Indenture.

4.    That FOUNDATION HOUSING, LLC is an Illinois Limited Liability Company and is the borrower described in the Indenture.

5.    That the Defendant, COLUMBIA MANAGEMENT ADVISORS, as bondholder, is the holder of $8,800,000 in bonds set forth and described in the Indenture.

6.    That SIT INVESTMENTS ASSOCIATES, INC., as bondholder, is the holder of $1,170,000 in bonds described in the Indenture.

7.    That pursuant to the Indenture and certain other documents and instruments not germane to this cause, Defendant COUNTY OF WILL issued the Series 2002A and Taxable Series 2002B bonds.

8.    That pursuant to the Indenture, certain monies have been paid to Plaintiff in its capacity as trustee under the Indenture, being payments of principal, redemption price, purchase price and interest that are due under Series 2002A and Taxable Series 2002B bonds.

9.    That Plaintiff presently holds in its possession as Trustee the sum of $485,560.47 for the payment of interest on bonds which was due March 1, 2005 (the "Fund").

10.    That at all times, Plaintiff has been ready, willing and able to make such interest payment to the bondholders of such bonds.

11.    That Section 507(a) of the Indenture, provides as follows:

> **"Use of Money in the Bond Fund.**   (a)   Except as otherwise provided in this Indenture and subject to the requirements of Section 507(c) hereof, money in the Interest Account will be used in connection with the payment of the interest on the Bonds as it becomes due as provided in Section 522 hereof. The Issuer authorizes and directs the Trustee on each Bond Interest Payment Date to apply funds in the Interest Account to pay such interest on

-2-

the Bonds according to Article II of this Indenture. The Trustee agrees to do so. If three days prior to a Bond Interest Payment Date there is not enough money in the Interest Account to make all the required payments, the Trustee shall transfer money to the Interest Account, three days prior to such Bond Interest Payment Date, first, from the available amounts in the Revenue Account as allocated according to Section 520 of this Indenture, second from the Management Fees Account of the Project Fund, third from the Debt Service Reserve Fund, fourth from the Prepayment Account, fourth from the Operating Reserve Fund, fifth from the Replacement Fund, and sixth from the Principal Account. Moneys in the Tax-Exempt Bonds Subaccount of the Capitalized Interest Subaccount shall be applied only to pay interest on the Tax-Exempt Bonds; and moneys in the Taxable Bonds Subaccount of the Capitalized Interest Subaccount shall be applied only to pay interest on the Taxable Bonds.

12.    That Section 907 of the Indenture provides as follows:

"**Removal of the Trustee.** The Trustee may be removed at any time by an instrument or concurrent instruments in writing signed by the Registered Owners of more than 50% of the aggregate principal amount of the Bonds then Outstanding and delivered to the Trustee and the Issuer. The Trustee may additionally be removed by a written instrument of the Issuer delivered to the Trustee and the Registered Owners of the Bonds then Outstanding. A removal takes effect upon the appointment of a successor or temporary Trustee by the Registered Owners or the Issuer and the successor or temporary Trustee's acceptance of its appointment, all in accordance with Section 403 of this Indenture."

13.    That on or about February 25, 2005, Plaintiff received an Instrument of Removal of Trustee, Appointment of Successor Trustee, and Acceptance by Successor Trustee, a true and exact copy of which is attached hereto marked Exhibit B and by reference thereto is specifically made a part hereof.

14.    That on or about February 25, 2005, Plaintiff received a direction from the Defendants, COLUMBIA MANAGEMENT ADVISORS, as Bondholders, and SIT INVESTMENT ASSOCIATES, INC., as Bondholders, directing Plaintiff to not make the March 1, 2005 interest payment on the Bonds, nor make any related transfers or money among the Trust Estate Accounts and to hold as part of the Trust Estate any and all monies received under or held on account of the Bonds which

otherwise would have been paid to holders of the Bonds as part of the March 1, 2005 interest payment. A true and exact copy of such direction is attached hereto marked as Exhibit C and by reference thereto is specifically made a part hereof.

15. That on March 1, 2005, Plaintiff's counsel received a communication from counsel for FOUNDATION HOUSING, LLC attached hereto marked as Exhibit D requesting that the Fund be used to pay the March 1, 2005 interest payment.

16. That as a result of the above, there are conflicting claims against Plaintiff with regard to the Fund.

17. That at all relevant times, Plaintiff has been and is now able, ready and willing to pay over the Fund to the person or persons lawfully entitled to receive same and to whom Plaintiff can pay it safely and Plaintiff hereby tenders the fund to the Court and is willing to pay it to such person or persons as the Court shall hereafter direct.

18. That Section 902 of the Indenture provides as follows:

> **"Trustee's Expenses.** The Trustee is entitled to payment or reimbursement of Trustee's Expenses. Upon the occurrence and continuance of an Event of Default, but only upon the occurrence and continuance of an Event of Default, the trustee and the Issuer have a lien with right to payment prior to payment on account of the principal of, premium, if any, and interest on any Bonds upon the Trust Estate and any other collateral securing the Bonds for the payment of the Trustee's Expenses and the Issuer's Expenses."

19. That the Trustee has expended and will continue to expend costs and attorneys' fees in the commencement and the prosecution of this action for which it seeks reimbursement pursuant to Section 902 of the Indenture.

For Plaintiff, MIDWEST BANK, requests the following relief:

1. That the Defendants and each of them severally determine to which of them the fund rightfully belongs and to whom it is payable.

2. That the Defendants may interplead and settle and adjust their demands between themselves; Plaintiff being willing and desirous that the fund be paid to such of them to whom it shall in the judgment of the Court, appear of right to belong.

-4-

Appendix B

    3.    That the Plaintiff deliver the fund to such officer or to whom this Court shall direct, which the Plaintiff now offers to do, for the benefit of such Defendants as shall appear to be entitled to it and subject to further Order of Court. Upon Plaintiff's deposit of the fund as the Court directs, it be dismissed as a party in this cause.

    4.    That Court award to Plaintiff its costs and attorneys' fees in this action.

    5.    The Plaintiff may have such other and further relief as the Court may deem just in the circumstances.

FIRST MIDWEST BANK, as Trustee
Under a Certain Indenture dated
May 22, 2002, Plaintiff

BY: _____
ROBERT S. KROCKEY
One of the Attorneys for Plaintiff

Robert S. Krockey/01532316
KROCKEY, CERNUGEL, COWGILL
CLARK & PYLES, LTD.
3100 Theodore Street
Suite 101
Joliet, IL 60435
(815) 729-3600

F:\HOME\barbara\Documents-Krockey\First Midwest Bank-Complaint for Interpleader

-5-

Appendix B

## **ATTORNEY'S STATEMENT**

I, the undersigned, state that I am one of the attorneys employed by the law firm of KROCKEY, CERNUGEL, COWGILL, CLARK AND PYLES, LTD., and that I represent the party who has executed the attached pleading. My business address is 3100 Theodore Street, Suite 101, Joliet, Will County, Illinois 60435. I certify that I have read the foregoing pleading and that to the best of my knowledge, information and belief, formed after reasonable inquiry of my clients, said pleading is well grounded in fact and is warranted by existing law or good-faith argument for the extension, modification, or reversal of existing law, and that said pleading is not interposed for any improper purposes, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Robert S. Krockey

KROCKEY, CERNUGEL, COWGILL
CLARK & PYLES, LTD.
3100 Theodore Street
Suite 101
Joliet, Illinois 60435
815/729-3600

-6-

# EXHIBIT E

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS

FIRST MIDWEST BANK, an Illinois )
banking corporation, )
                        )
       Plaintiff, )
                        )
                        )
v. )
                        )       Case No. 05 CH 0503
THE COUNTY OF WILL, a body politic )
and corporation, FOUNDATION )
HOUSING, LLC, an Illinois limited )
liability company, COLUMBIA )
MANAGEMENT ADVISORS, and SIT )
INVESTMENT ASSOCIATES, INC., )
                        )
       Defendants. )

### NOTICE OF MOTION

TO:   SEE ATTACHED SERVICE LIST

     PLEASE TAKE NOTICE that on April 8, 2005 at 8:30 a.m., the undersigned shall appear before the Honorable Judge Herman S. Haase in Courtroom 2 of the Will County Court House, 14 W. Jefferson Street, Joliet, Illinois 60432, and shall then and there present **MANUFACTURERS AND TRADERS TRUST COMPANY'S PETITION TO INTERVENE**, a copy of which is attached hereto and hereby served upon you.

                 By:   _____

                         Greenberg Traurig, LLP
                         Francis A. Citera (ARDC No. 6185263)
                         Matthew F. Prewitt (ARDC No. 6237904)
                         Edward M. Shin (ARDC No. 6275913)
                         GREENBERG TRAURIG LLP
                         77 West Wacker Drive, Suite 2500
                         Chicago, Illinois 60601
                         (312) 456-8400 – Telephone
                         (312) 456-8435 – Facsimile

                         Of Counsel:
                         Warren S. Bloom (FL Bar No. 838616)
                         Amy F. Lowen (FL Bar No. 0492248)
                         GREENBERG TRAURIG, P.A.
                         450 South Orange Ave., Suite 650
                         Orlando, FL 32801
                         (407) 420-1000 – Telephone
                         (407) 650-8482 – Fax

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS

FIRST MIDWEST BANK, an Illinois )
banking corporation, )
        )
        Plaintiff, )
        )
v. )
        )    Case No. 05 CH 0503
THE COUNTY OF WILL, a body politic )
and corporation, FOUNDATION )
HOUSING, LLC, an Illinois limited )
liability company, COLUMBIA )
MANAGEMENT ADVISORS, and SIT )
INVESTMENT ASSOCIATES, INC., )
        )
        Defendants. )

## MANUFACTURERS AND TRADERS TRUST COMPANY'S
## PETITION TO INTERVENE

Manufacturers and Traders Trust Company, in its capacity as Successor Trustee ("MTTC" or "Successor Trustee"), by and through its undersigned attorneys, hereby petitions to intervene in this matter pursuant to Section 2-408 of the Illinois Code of Civil Procedure. In support of this Motion, MTTC states as follows:

### INTRODUCTION

1.     MTTC's intervention in this interpleader proceeding is warranted for one simple reason: MTTC is the only entity with a clear and immediate right to the interpleaded funds. As set forth below, First Midwest Bank ("FMB" or "Prior Trustee") is not the trustee of the bonds whose funds have been interpleaded. *Before* FMB instituted this action, the required majority of bondholders (the "Majority Bondholders") had already *removed* FMB as trustee and had appointed MTTC as the sole trustee, all in accordance with the terms of the Indenture, as hereinafter defined.

1

2. FMB received from the Majority Bondholders a valid and binding instruction to pay over, assign, and deliver all of the trust assets and monies to MTTC, and neither FMB nor any other party has ever disputed that instruction. Nonetheless, FMB filed this interpleader action without authority and without even naming MTTC as a defendant. This interpleader action is simply a ploy for FMB to delay compliance with the instruction that has removed FMB as Trustee. Since the validity of the Majority Bondholders' instruction has never been disputed, FMB must comply immediately.

3. As the Successor Trustee, MTTC is the only entity with an immediate right to the interpleaded funds. FMB had no right to disregard the Majority Bondholders' undisputed instruction appointing MTTC as Successor Trustee. FMB has breached its fiduciary duty to all of the bondholders and cannot now use an interpleader action as a shield from liability for its bad faith acts. Accordingly, MTTC seeks to assert counterclaims against FMB for breach of its fiduciary duties and for conversion of the trust funds, and to receive an award of injunctive relief compelling FMB's compliance with the Majority Bondholders' instructions, compensatory damages, punitive damages, and attorneys' fees and costs. MTTC's counterclaims clearly share common questions of law with those issues already raised in these proceedings, thus providing another justification for MTTC's intervention in this action. Indeed, even if this Court were to find that the interpleaded funds should not be directed to MTTC as Successor Trustee, MTTC would still have the right to assert a claim for recovery of its attorneys' fees from the interpleaded funds. MTTC's intervention in this matter is clearly warranted.

## BACKGROUND

4. Pursuant to that certain Trust Indenture, dated as of May 1, 2002 (the "Indenture"), between The County of Will, Illinois ("Will County") and FMB, as Trustee, Will

2

County issued its $13,985,000.00 Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A, and its $470,000.00 Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (collectively, the "Bonds"). The Indenture was recorded on May 23, 2002 in the Office of the Will County Recorder of Deeds as Document R2002086521, and is attached hereto as Exhibit A.

5.      Pursuant to that certain Loan Agreement, dated as of May 1, 2002 (the "Loan Agreement"), between Will County and Foundation Housing, LLC ("Foundation Housing" or the "Borrower"), both of whom are defendants in this action, Will County loaned the proceeds of the Bonds to the Borrower, and the Borrower agreed to repay such loan. The Loan Agreement was recorded on May 23, 2002 in the office of the Will County Recorder of Deeds as Document R2002086522. The obligations of the Borrower were further evidenced by that certain Note No. 1, dated May 1, 2002, from the Borrower to Will County in the principal amount of $14,455,000 (the "Note"), and that certain Mortgage, Security Agreement, and Assignment of Rents and Leases, dated as of May 1, 2002, by the Borrower in favor of Will County and assigned to the Trustee (the "Mortgage"), which was recorded on May 23, 2002 in the office of the Will County Recorder of Deeds as Document R 2002086520.

6.      Under the terms of the Indenture, the Loan Agreement, the Note, and the Mortgage, Will County assigned all of its right, title, and interest in and to the Loan Agreement (with limited exceptions pertaining to Will County's rights to indemnity, to decline to make additional loans, and to receive notices), the Note and the Mortgage to the Trustee under the Indenture. This assignment explicitly included Will County's assignment to the Trustee of Will County's right to receive payments from the Borrower under the Loan Agreement, the Note, and the Mortgage. These payments by the Borrower repaid the loan of the proceeds of the Bonds,

and were to be made directly to the Trustee on behalf of the holders of the Bonds (the "Bondholders").

7.    On February 24, 2005, Columbia Management Advisors ("Columbia") and SIT Investment Associates, Inc. ("SIT," and collectively with Columbia, the "Majority Bondholders"), then owners of approximately 69% in aggregate principal amount of the Bonds, delivered to FMB an "Instrument of Removal of Trustee, Appointment of Successor Trustee, and Acceptance by Successor Trustee" dated February 23, 2005 ("Instrument of Removal"), which is attached hereto as Exhibit B.

8.    The Majority Bondholders owned more than the aggregate principal amount of the outstanding Bonds required to execute the Instrument of Removal, pursuant to Section 908 of the Indenture.

9.    Under the Instrument of Removal, the Majority Bondholders removed FMB as Trustee under the Indenture, and also as trustee of funds, as registrar, and as paying agent for the Bonds, pursuant to Sections 907 and 910 of the Indenture. (Exhibit B at p. 2.) The removal of FMB from these roles was effective immediately upon FMB's receipt of the Instrument of Removal. (Exhibit B at p. 2.)

10.    Section 907 of the Indenture, as referenced in the Instrument of Removal provides:

> **Removal of the Trustee.** The Trustee may be removed at any time by an instrument or concurrent instruments in writing signed by the Registered Owners of more than 50% of the aggregate principal amount of the Bonds then Outstanding and delivered to the Trustee and the Issuer. The Trustee may additionally be removed by a written instrument of the Issuer delivered to the Trustee and the Registered Owners of the Bonds then Outstanding. A removal takes effect upon the appointment of a successor or temporary Trustee by the Registered Owners or the Issuer and the successor or temporary Trustee's acceptance of its appointment, all in accordance with Section 403 of this Indenture.

4

(Exhibit A at p. 47.)

11.     Section 910 of the Indenture, as referenced in the Instrument of Removal, provides:

> **Successor Trustee as Trustee of Funds, Paying Agent and Registrar.** In the event the Trustee is changed the Prior Trustee which has resigned or been removed ceases to be trustee of the Indenture Funds and Registrar and paying agent for principal of, premium, if any, and interest on the Bonds and the successor Trustee becomes the Trustee, Registrar, and paying agent.

(Exhibit A at p. 48.)

12.     Under the Instrument of Removal, the Majority Bondholders appointed MTTC as Successor Trustee pursuant to Section 908 of the Indenture, and also provided that MTTC should act as trustee of funds, as registrar, and as paying agent for the Bonds as required under Section 910 of the Indenture.  (Exhibit B at p. 2.)

13.     Section 908 of the Indenture, as referenced in the Instrument of Removal, provides:

> **Successor or Temporary Trustee.** In case the Trustee resigns, [or] is removed, … a successor may be appointed by the holders of more than 50% of the aggregate principal amount of the Bonds then Outstanding by an instrument or concurrent instruments in writing signed by the holders of more than 50% of the aggregate principal amounts of the Bonds then Outstanding.

(Exhibit A at p. 47.)

14.     The Instrument of Removal, in accordance with Section 909 of the Indenture, provided that the appointment of the Successor Trustee was "effective immediately upon receipt of this Instrument by the Prior Trustee, the Issuer, and the Borrower," and further stated that immediately upon such receipt, "the Successor Trustee shall become fully vested with all the property, rights, powers and duties of the Prior Trustee under the Indenture." (Exhibit B at p. 2.) FMB, therefore, was instructed to *"pay over, assign and deliver to [MTTC] any money or other property subject to the trusts and conditions set forth in the Indenture."* (Exhibit B at p. 3.)

15.     The Majority Bondholders also executed a letter to both the Prior Trustee and the Successor Trustee, dated February 23, 2005 and delivered on February 24, 2005 (the "Letter of Direction," attached hereto as Exhibit C), directing, among other things, that the March 1, 2005 interest payment on the Bonds should not be made. It could not be known when the Prior Trustee would comply with the Instrument of Removal and pay over to the Successor Trustee any monies subject to the trusts and conditions of the Indenture. Therefore, the Letter of Direction referenced the Instrument of Removal and explained that the direction not to make the March 1, 2005 interest payment on the Bonds applied to whichever of the Prior Trustee and the Successor Trustee had possession or control of the Bonds' trust estate at the relevant times. The Letter of Direction was in accordance with the terms of the Indenture.

16.     The Borrower has no rights whatsoever with regard to funds held by the Trustee under the Indenture. Nonetheless, the Borrower – which itself is in default under the terms of the Loan Agreement – wrote to counsel to the Successor Trustee objecting to the Letter of Direction. Significantly, the Borrower did not object to the Instrument of Removal.

17.     FMB received the Instrument of Removal eleven days before commencing this action. No party had then or has since disputed the validity of the Instrument of Removal. Despite the Instrument of Removal's clear instructions that FMB must immediately assign and deliver all of the trust funds to MTTC, FMB took no steps to comply with the Instrument of Removal. Instead, on March 7, 2005, FMB filed with this Court its Complaint for Interpleader, alleging that "there are conflicting claims against [FMB] with regards to" the interpleaded sum of $485,560.47, which constitutes the "payment of interest on bonds which was due March 1, 2005." (Complaint for Interpleader at ¶¶ 9 and 16.)

6

## ARGUMENT

18.     This Court should permit MTTC's intervention because MTTC is the only party with an immediate and undisputed right to immediate possession of the interpleaded funds. Section 2-408 of the Illinois Code of Civil Procedure permits intervention "when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer." 735 ILCS 5/2-408(a)(3) (West 2004). The purpose of intervention "is to expedite litigation by disposing of the entire controversy among the persons involved in one action to prevent a multiplicity of actions." *Home Ins. Co. v. Lorelei Restaurant Co.*, 83 Ill. App. 3d 1083, 1086, 404 N.E.2d 895 (1st Dist. 1980) (quoting *University Square, Ltd. v. City of Chicago*, 73 Ill. App. 3d 872, 877-78, 392 N.E.2d 136 (1st Dist. 1979)). Furthermore, "the intervention statute is remedial in nature and as such, should be construed liberally." *In re Marriage of Hartian*, 172 Ill. App. 3d 440, 450, 526 N.E.2d 1104 (1st Dist. 1988).

19.     MTTC, as the current Trustee for the Bonds, has not been served with FMB's Complaint for Interpleader. MTTC is expressly granted the authority to intervene in the instant action on behalf of the bondholders pursuant to Section 904 of the Indenture, which provides:

> **Intervention by Trustee**. The Trustee may ... intervene on behalf of the holders of the Bonds in any judicial proceedings to which the Issuer is a party and which in the opinion of the Trustee and its Counsel *has a substantial bearing on the interests of the holders of Bonds.*

(Exhibit A at p. 46) (emphasis added.) Because this action will determine the disposition of the interpleaded funds, the outcome of these proceedings "has a substantial bearing on the interests of the holders of the Bonds," and justifies MTTC's intervention in the matter.

20.     MTTC has attached as Exhibit D to this Petition its proposed pleading, which responds to FMB's Complaint for Interpleader. MTTC's proposed pleading specifically denies

7

that FMB is the current Trustee of the bonds, or that FMB rightfully held in its possession the now interpleaded funds. MTTC further asserts that this is not a proper interpleader, as no party has alleged that MTTC is not the Successor Trustee or that MTTC, as Successor Trustee, should not be in possession and control of the interpleaded funds. MTTC further denies that FMB is entitled to its attorneys' fees and costs pursuant to Section 902 of the Indenture because FMB was not the trustee at the time it instituted this interpleader action. Additionally, such costs are not covered if they result from FMB's gross negligence or willful default. Here, FMB's refusal to follow the Bondholders' valid and binding instructions, as expressly required by the Indenture, clearly constitutes a willful default and does not merit any recovery of its attorneys' fees or costs. MTTC, conversely, is entitled to its attorneys' fees under the Indenture. Accordingly, even if this Court were to find that the interpleaded funds should not be directed to MTTC as Successor Trustee, MTTC would still have the right to assert a claim for recovery of its attorneys' fees from the interpleaded funds.

21.    In light of FMB's willful misconduct, MTTC's proposed pleading also asserts counterclaims against FMB for breach of fiduciary duty and conversion of the now-interpleaded trust funds, and a cross claim against all defendants seeking a declaration that the Indenture and Instrument of Removal has conferred on MTTC all of the rights and powers of a trustee under the Indenture.

22.    The counterclaims asserted by MTTC against FMB also provide another basis for intervention under Section 2-408(b), as those counterclaims "and the [interpleader] action have a question of law or fact in common." 735 ILCS 5/2-408 (West 2004). Here, MTTC's claims against FMB for breach of fiduciary duty and conversion of the trust funds share common

8

# EXHIBIT F

**Subject:** FW: Joliet



SDOC1765.pdf
(694 KB)

From: Lowen, Amy E. (Assoc-Orl-BD)
Sent: Tuesday, April 05, 2005 5:27 PM
To: 'atc@sitinvest.com'; 'DeWalds@bellsouth.net'
Cc: Bloom, Warren S. (Shld-Orl-BD)
Subject: Joliet


The attached draft is intended to be direction from the bondholders to both First Midwest and MandT, and it directs that the Interpleader Case be voluntarily dismissed, that MandT be paid its fees and expenses, and that First Midwest be reinstated as trustee under the indenture. In the interests of time, I'm sending this draft to you at the same time as it is being reviewed by us, so I must reserve our client's right to comment too.

The fees and expenses of MandT are currently estimated at $42,000. The vast majority of this is due to interference by the Borrower's counsel which ultimately led First Midwest to file its Complaint for Interpleader, which, in turn, obligated MandT as a fiduciary to respond. A hearing in this matter is scheduled first thing in the morning on Friday, April 8. The $42,000 estimate is based on matters being resolved very quickly, so that the additional fees and expenses of that hearing will not be incurred.

Please let me know your comments. Thank you,

Amy

Amy E. Lowen, Esq.
Greenberg Traurig
450 South Orange Ave, Suite 650
Orlando, FL 32801
phone 407-999-2529
fax      407-650-8482

1

**Direction to Trustee(s)**
**and**
**Instrument of Removal of Trustee,**
**Appointment of Successor Trustee, and**
**Acceptance by Successor Trustee**

**"Direction and Instrument"**

April ___, 2005

*via Federal Express*

First Midwest Bank
2801 West Jefferson Street
Joliet, Illinois 60435
Attn: Corporate Trust Department

Manufacturers and Traders Trust Company
Corporate Trust Services
25 South Charles Street, 16th Floor
Baltimore, MD 21201
Attn: Mr. Jacob Smith, Vice President

Foundation Housing, LLC
c/o Joliet Junior College Foundation
1215 Houbolt Road
Joliet, Illinois 60431
Attn: President

The County of Will, Illinois
302 North Chicago Street
Joliet, Illinois 60432
Attn: Office of Will County Executive

> RE: **$13,985,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Series 2002A; and $470,000 The County of Will, Illinois Student Housing Revenue Bonds (Joliet Junior College Project), Taxable Series 2002B (collectively, the "Bonds")**

Ladies and Gentlemen:

Reference is made to that certain Trust Indenture, dated as of May 1, 2002 (as the same may have been amended, the "Indenture"), by and between The County of Will, Illinois (the "Issuer") and First Midwest Bank, an Illinois banking corporation, as Trustee ("First Midwest"), pursuant to which the above-referenced Bonds were issued, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086521. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Indenture. Reference is also made to that certain Loan Agreement, dated as of May 1, 2002 (the "Loan Agreement"), between the Issuer and Foundation Housing, LLC (the "Borrower"), pursuant to which the Issuer loaned the proceeds of the Bonds to the Borrower, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086522; and to that Mortgage, Security Agreement and Assignment of Rents and Leases, dated as of May 1, 2002 (the "Mortgage"), by the Borrower in favor of the Issuer and assigned to the Trustee as security for the payment of the Bonds, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086520.

Pursuant to that "Instrument of Removal of Trustee, Appointment of Successor Trustee, and Acceptance by Successor Trustee" dated February 23, 2005 (the "February Instrument;" attached hereto as Exhibit A), and as more fully stated therein, First Midwest was replaced by Manufacturers and Traders Trust Company ("MandT") as Trustee under the Indenture, and First Midwest was directed to pay over, assign and deliver to MandT all money and other property subject to the trusts and conditions of the Indenture.

Direction and Instrument
April _____, 2005
Page 2

On March 7, 2005, First Midwest filed its "Complaint for Interpleader" in the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois, and deposited with that Court certain monies subject to the trusts and conditions of the Indenture and stated to be in the amount of $485,560.47 (the "Interpleaded Monies"), thereby commencing Case No. 05 CH 0503 (the "Interpleader Case"). To meet its fiduciary obligations as Trustee under the Indenture pursuant to the February Instrument, on March 30, 2005, MandT filed a Petition to Intervene in the Interpleader Case, and a hearing on such Petition to Intervene is scheduled for Friday, April 8, 2005.

First Midwest did not comply with direction of the February Instrument in any way, and none of the money, other assets, documents, records, information or any other type of property held by First Midwest as Trustee under the Indenture were ever delivered to MandT.

As a result of all of the foregoing, the February Instrument was not recorded in the recording office(s) where the Borrower's Documents were recorded.

The undersigned (the "Bondholders") are the owners of approximately 69% in aggregate principal amount of the Outstanding Bonds as of this date.

**MandT AND FIRST MIDWEST ARE HEREBY DIRECTED BY THE UNDERSIGNED BONDHOLDERS AS FOLLOWS IN PARAGRAPHS 1 AND 2 (all such direction, collectively, the "Direction"):**

1. MandT and First Midwest shall cooperate in achieving the voluntary dismissal of the Interpleader Case, including without limitation executing the Stipulation, the form of which is attached hereto as Exhibit B. First Midwest shall promptly file the Stipulation.

2. No later than the next business day after receiving the Interpleaded Funds, (i) MandT shall provide First Midwest with wiring information and with the amount of the fees and expenses incurred by MandT due to the Interpleader Case and related matters and due to its appointment as Trustee under the Indenture pursuant to the February Instrument, and (ii) First Midwest shall accordingly wire such amount to MandT. It is expected that such fees and expenses will be approximately $42,000.00.

**THE FOLLOWING REMOVAL OF TRUSTEE, APPOINTMENT OF SUCCESSOR TRUSTEE, AND ACCEPTANCE BY SUCCESSOR TRUSTEE SHALL BE EFFECTIVE ONLY UPON, AND SHALL NOT BE DEEMED TO HAVE BEEN DELIVERED OR TO HAVE BEEN RECEIVED UNTIL, MandT AND FIRST MIDWEST SHALL HAVE FULLY COMPLETED AND COMPLIED WITH ALL OF THE ABOVE DIRECTION.**

Removal of Trustee

Pursuant to Section 907 of the Indenture, the Bondholders hereby remove MandT as Trustee, effective immediately upon full completion of and compliance with the Direction and receipt by MandT of this Direction and Instrument. Pursuant to Section 910 of the Indenture, MandT is also removed as trustee of funds, as Registrar, and as paying agent for the Bonds. All following provisions of this Instrument pertaining to MandT shall also pertain to MandT as trustee of funds, as Registrar, and as paying agent for the Bonds.

Direction and Instrument
April ____, 2005
Page 3

Nothing herein shall relieve MandT of any duty in the Indenture or under applicable law requiring MandT to assist in the orderly transfer of the Trust Estate under the Indenture and to confirm the Trust Estate in First Midwest, including, without limitation, the duties of MandT under Section 909 of the Indenture, and the duties set forth more fully below.

Appointment of Successor Trustee

Pursuant to Section 908 of the Indenture, the Bondholders hereby appoint First Midwest as successor Trustee, effective immediately upon full completion of and compliance with the Direction and receipt of this Direction and Instrument by MandT, the Issuer and the Borrower.

Acceptance of Successor Trustee

By its signature below, First Midwest hereby accepts its appointment as successor Trustee, pursuant to Section 909 of the Indenture. First Midwest hereby agrees to act as trustee of funds, as Registrar, and as paying agent for the Bonds as required under Section 910 of the Indenture. Also by its signature below, First Midwest represents that it is a trust company or a bank in good standing having a reported capital and surplus of not less than $75,000,000 or having assets under administration of not less than $100,000,000. This Direction and Instrument shall constitute notice of acceptance by First Midwest pursuant to Section 909 of the Indenture.

Direction and Instrument to be Filed for Record

Pursuant to Section 909 of the Indenture, First Midwest shall have this Direction and Instrument, including its Exhibits, filed and/or recorded in each recording office where any of the Borrower's Documents (as defined in the Indenture and Loan Agreement) has been filed and/or recorded.

Effect of Removal and Appointment

Immediately upon full completion of and compliance with the Direction and receipt of this letter by MandT, First Midwest shall become fully vested with all the property, rights, powers and duties of the Trustee under the Indenture. Copies of this Direction and Instrument shall be sent simultaneously to MandT, First Midwest, the Borrower, the Issuer and the Bondholders by overnight delivery such that removal of MandT and appointment of First Midwest shall be simultaneous.

Because none of the money, other assets, documents, records, information or any other type of property held by First Midwest as Trustee under the Indenture were ever delivered to MandT, all obligations of the Trustee under the Indenture, whether arising before, on or after the date hereof, shall be the responsibility of First Midwest, and MandT shall have no responsibility for trust assets or security instruments or any other obligations under the Indenture.

MandT shall be held harmless and shall remain fully indemnified as Trustee under the Indenture, pursuant to the terms of the Indenture, including without limitation with regard to all matters related to or arising out of the Bonds, the Indenture, the February Instrument, the Interpleader Case, the Stipulation, and this Direction and Instrument, which indemnification shall not be terminated by this or any other document.

Direction and Instrument
April _____, 2005
Page 4

[NEED INFO RE NEW BONDHOLDER]

By  _____
Name
Title

[NEED ADDRESS AND CONTACT INFO OF NEW
BONDHOLDER]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Direction and Instrument
April _____, 2005
Page 5

SIT INVESTMENT ASSOCIATES, INC., AS
BONDHOLDER, holding Bonds in the total principal
amount of $1,170,000.00 in the following funds: Sit Tax-
Free Income Fund ($500,000); and four private accounts
(collectively $670,000.00).

By      _____
Name    _____
Title   _____

Sit Investment Associates, Inc.
3300 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Attn:   Paul Jungquist
Tel.:   612-359-2546
Fax:    612-313-0326
pjj@sitinvest.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Direction and Instrument
April ____, 2005
Page 6

Acceptance of Successor Trustee:

FIRST MIDWEST BANK, AS SUCCESSOR TRUSTEE

By      _____
Name
Title

Originals via Federal Express:
    [NEW BONDHOLDER]
    Mr. Paul Jungquist, Sit Investment Associates, Inc.
Copy:   Warren S. Bloom, Esq.

INSTRUMENT OF RESCISSION OF INSTRUMENT OF REMOVAL OF TRUSTEE AND APPOINTMENT OF SUCCESSOR TRUSTEE, DATED FEBRUARY 23, 2005, AND THE REJECTION AND VOIDANCE OF THE ACCOMPANYING ACCEPTANCE OF MANUFACTURERS AND TRADERS TRUST COMPANY AS THE SUCCESSOR TRUSTEE, ALL IN CONNECTION WITH THE COUNTY OF WILL, ILLINOIS STUDENT HOUSING REVENUE BONDS (JOLIET JUNIOR COLLEGE PROJECT), SERIES 2002A, ORIGINALLY ISSUED IN THE PRINCIPAL AMOUNT OF $13,985,000; AND THE COUNTY OF WILL, ILLINOIS STUDENT HOUSING REVENUE BONDS (JOLIET JUNIOR COLLEGE PROJECT), TAXABLE SERIES 2002B, ORIGINALLY ISSUED IN THE PRINCIPAL AMOUNT OF $470,000.

June 6th, 2005

First Midwest Bank
2801 West Jefferson Street
Joliet, Illinois 60435
Attention: Corporate Trust Department

Manufacturers and Traders Trust Company
Corporate Trust Services
25 South Charles Street, 16th Floor
Baltimore, MD 21201
Attention: Mr. Jacob Smith, Vice President

The County of Will, Illinois
302 North Chicago Street
Joliet, Illinois 60432
Attention: Office of Will County Executive

Foundation Housing, LLC
c/o Joliet Junior College Foundation
1215 Houbolt Road
Joliet, Illinois 60431
Attention: President

Reference is made to that certain Trust Indenture, dated as of May 1, 2002 (as the same may have been amended, the "Indenture"), by and between The County of Will, Illinois (the "Issuer") and First Midwest Bank, Joliet, Illinois, an Illinois banking corporation, as Trustee (the "Trustee"), pursuant to which the above-referenced Bonds (the "Bonds") were issued, and recorded on May 23, 2002, in the office of the Will County Recorder as document R 2002086521. Capitalized terms not defined herein shall have

Instrument of Rescission of Instrument of Removal of Trustee and Appointment of Successor Trustee, dated February 23, 2005, and the Rejection and Voidance of the accompanying Acceptance of Manufacturers and Traders Trust Company as the Successor Trustee
June __6th__, 2005
Page 3

The undersigned hereby rescinds and deems void *ab initio* the Removal Instrument. First Midwest Bank, as Trustee, is hereby directed and instructed by the undersigned to disregard the Removal Instrument and to continue to perform its duties as trustee in connection with the Bonds. First Midwest Bank, as Trustee, is hereby directed to transfer the funds it is holding in connection with the payment of interest on the Bonds into a separate account with First Midwest Bank in the names of the undersigned, as tenants in common in accordance with their respective interests of ownership. Such transfer shall be deemed by the undersigned to be the payment of accrued interest on the Bonds. Concurrently with such transfer the undersigned shall execute whatever instruments are required by First Midwest Bank in connection with the use and disposition of such funds in such separate account.

The undersigned Bondholders shall indemnify and hold First Midwest Bank, its employees and agents harmless of and from all loss, cost or expense arising out of or founded upon any act taken in reliance on this Instrument.

This Instrument shall be deemed, to the extent required by law, as the removal of Manufacturers and Traders Trust Company, as Successor Trustee, and the confirmation of appointment and re-appointment of First Midwest Bank, as Trustee, in accordance with the terms and provisions of the Indenture. First Midwest Bank, as Trustee, shall execute its Acceptance in the form attached as Schedule B and provide executed counterparts to the undersigned as well as the Borrower and the Issuer.

Dated this ___6th___ day of June, 2005

JOSEPH BUIE III
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Mar. 16, 2008

BERGEN CAPITAL, INC.,
A New Jersey Corporation

By: _____
James A. Swan
Senior Vice President

Dated this ___6___ day of June, 2005

HEMISPHERE TRUST

By: _[signature]_
Francis R. DeWald
Bondholder / REPRESENTATIVE

4

Dated this ____3rd____ day of June, 2005

                    SIT INVESTMENT ASSOCIATES, INC.,

                    By: *Debra a. S. [signature]*

                       Vice President

7

## ACCEPTANCE

The undersigned, FIRST MIDWEST BANK, does hereby accept its appointment and re-appointment, as Trustee, in accordance with the terms of the Indenture and the Instrument of Recession of Instrument of Removal to which this Acceptance is a part.

Dated this _____ day of June, 2005

FIRST MIDWEST BANK

By:_____

David Burton
Trust Officer